[No. 20634. Department One. — August 11, 1890.]

THE PEOPLE, RESPONDENT, *v.* J. W. MURRAY, APPELLANT.

JURY — DISCHARGE OF JURORS — VERDICT WILLFULLY AGAINST EVIDENCE. — Where a verdict rendered by a jury in a criminal case is such as to convince the trial court that the jury had purposely and willfully disregarded the evidence and returned a verdict in violation of their sworn duty, it is the duty of the judge to discharge the jurors rendering such verdict from further service or attendance in other criminal cases; and in the absence of any showing to the contrary, it must be presumed, in favor of the action of the court, that the case was such as to justify the discharge of jurors upon that ground.

ID. — DISCHARGE OF TEMPORARY JURY — SUFFICIENCY OF REASON. — The trial court has the right to discharge a jury, or any of them, not selected to try a pending case, nor selected to serve for any fixed term, at any time, without giving any reason for such discharge, and without the existence of a reason; and in such case the fact that a reason was assigned, which in some cases might be insufficient, is immaterial.

ID. — DISCHARGE OF PANEL WITHOUT PREJUDICE — RIGHTS OF DEFENDANT — SUMMONING NEW PANEL. — Where the discharged jury was not selected for the trial of the defendant's case, the defendant had no vested right to a trial by such jury, and where the jury by which the defendant was tried was ordered to be summoned in precisely the same way that the discharged jury had been selected and summoned, and it is not shown or claimed that the jurors thus selected were less favorable to the defendant than the discharged jurors would have been, no injury could result to the defendant by reason of such discharge, as all of his rights of challenge to the new jurors were preserved.

EVIDENCE — CROSS-EXAMINATION — IMPEACHMENT OF WITNESS — STATEMENTS SHOWING ANIMUS. — Where a witness testified favorably to the defendant in his examination in chief, it is competent to ask, on cross-examination, whether he had not made statements out of court tending to show his friendly feeling toward the defendant, and whether he had not expressed an intention to suppress facts within his knowledge that would injure defendant's case; and such statements may be proved to impeach the witness, if he denies making them.

ID. — IMMATERIAL IMPEACHMENT. — If the testimony tending to impeach a witness is immaterial, it cannot be held to have injured the party calling him, if it does not appear that the testimony impeached was material.

NEW TRIAL — IMPROPER INFLUENCE UPON JURY — EVIDENCE. — Evidence is admissible in support of a motion for a new trial by one who has been convicted, to show that the verdict rendered against him is the result of improper influences.

ID. — VIOLATION OF RIGHT TO FAIR TRIAL. — An attempt on the part of any person, whether through the medium of a newspaper or otherwise, to influence a jury by any improper means to bring in a verdict against

a defendant in a criminal case, is a palpable violation of his right to a fair and impartial trial, and if it appears to the court to have had such an effect, a new trial should be granted.

Id. — Newspaper Publication — Intimidation of Jury — Inquiry as to Effect. — Where it was the clear intention of the publishers of a newspaper to intimidate the jury, and by abusing other jurors who had returned verdicts of acquittal, to induce them to find the defendant guilty, and impose upon him the extreme penalty of the law, the defendant has the right to have the court determine, on his motion for a new trial, the question as to whether the newspaper article had that effect or not upon the jury, and may make the proof, with leave to the people to show, if possible, that the particular articles were not read by the jury, or if they were, that the jury were not in any way influenced by them.

Appeal from a judgment of the Superior Court of San Diego County, and from an order denying a new trial.

The facts are stated in the opinion of the court.

*Hunsaker & Britt*, for Appellant.

*Attorney-General Johnson*, for Respondent.

Works, J. — The defendant was charged, tried, and convicted of the crime of murder, and sentenced to be hanged. He moved for a new trial, his motion was denied, and he appeals. The first error complained of relates to the selection of a jury. On the thirtieth day of September, 1889, the court below made the following order: —

"To the sheriff of said county, greeting: —

"Whereas, the business of the superior court requires the attendance of a trial jury for the trial of criminal cases, and no jury is in attendance, it is the order of the court that you are hereby directed to summon forty (40) men having qualifications of jurors, from the body of this San Diego County, state of California, to be and appear in department No. 3 of the superior court, at the court-room, in the Express Block, on the northeast corner of Sixth and F streets, in the city of San Diego, county of San Diego, state of California, on Monday, October 7,

A. D. 1889, at the hour of 9 o'clock, a. m., of said day, and of this writ make legal service and due return."

The clerk issued a *venire* in accordance with this order, and the same was placed in the hands of the sheriff, who made return that he had duly summoned the number of jurors required, giving the names of those summoned. Afterwards, on the seventh day of October, 1889, the case of *People* v. *Tower*, charged with the crime of an assault with a deadly weapon, came on for trial, and the jurors, selected as above, were called, and a jury of their number impaneled, who tried the cause, and returned a verdict of guilty of a simple assault. Again, on the fourteenth day of October, 1889, the case of *People* v. *Chapo* was called for trial. The jurors, above mentioned, appeared for duty in said cause, whereupon the district attorney moved the court to discharge from further duty as jurors the persons who had served as jurors in the case of *People* v. *Tower*. The bill of exceptions shows that the motion of the district attorney was based on the ground that the verdict of these jurors in the Tower case was so palpably in opposition to the evidence given in the case, and in violation of their duties as such jurors, that they were unworthy to sit in other causes. The judge of the court below seems, from his remarks in passing on the motion, to have agreed with the district attorney, and an order was made discharging the jurors, which does not, however, state upon what ground, except that it was for ample and sufficient reasons.

On the seventeenth day of October, 1889, this cause was called for trial, and the following proceedings were had, as recited in the bill of exceptions:—

"The defendant, by his counsel, moved the court to vacate and set aside the order of said court, made by the court on the fourteenth day of October, 1889, discharging from further service or attendance, as jurors, J. R. Scranton, Robert Steadman, J. H. Tyler, W. W. Collier, W. H. Crawford, Andrew Casady, F. M. Green, Sam

Deeble, Henry Cook, A. D. Starkweather, Thomas Tighe, and Jacob Vanderwaite, on the ground that said order was made without authority of law or power on the part of the court to make the same, and in support of said motion, called and examined W. W. Whitson, who testified as follows, to wit:—

"I am the official short-hand reporter of department No. 3 of the superior court of this county. I was acting as such reporter of said court on the fourteenth day of the present month, when the order referred to was made by the court. I don't know that I took all the proceedings at that time, but I think I did. Here is a sheet with some notes on it; I don't know that it has all the proceedings had at that time, but it has all that was said by the court and Mr. Daney. Mr. Daney said at that time: 'I have a motion which I desire to make this morning, before any juror in selected in this case [*People* v. *Chapo*]. My motion is this: Last Friday, the jury in the Tower case rendered a verdict that it seems to me must have been arrived at only after a total disregard to the instructions of the court and the evidence in the case. It seems to me that it must have required a great stretch of the imagination to have brought in such a verdict as was brought in in that case, and the jurymen must be very tired after rendering that verdict, and perhaps a little vacation would not do them any harm. It is just such verdicts as this that bring the court and the law into contempt and disrespect by the community, and it seems to me that it is my duty, however unpleasant it may be, to state to the court that I do not feel that I could select the gentlemen that were on that jury on this jury this morning with any degree of safety. It seems to me that that verdict is so outrageously beyond and outside of the evidence, and beyond and outside the law of the case, that it makes one feel indignant to think that twelve men would bring in such a verdict, and I say, though unpleasant the duty may be,

I think it is my duty, it is a duty I owe to the community, to make a motion that the twelve gentlemen that served on that jury be discharded from further attendance on this court.'

"The court said: 'It is the opinion of the court that the verdict of the jury in that case must have surprised even the most sanguine expectations of counsel for the defense. Mr. Hunsaker, I remember, said to the jury that he accepted the challenge of the district attorney, and that the jury in this case should bring in either a verdict of guilty as charged in the indictment, or a verdict of acquittal. The jury might have brought in a verdict of acquittal in that case, and no discredit could have attached to their finding, because evidence was before them which tended to establish an *alibi*, and they had a right, if they desired, to believe that evidence, and to discard the evidence on the part of the prosecution tending to show that the defendant was at the place where the assault with intent to commit murder was effected; but when the jury brought in a verdict of simple assault in a case where the evidence showed, and the jury believed by their verdict, that an assault had been made, and the evidence showed that the assault was made with a loaded pistol which was then and there rapidly fired, the jury, in order to bring in the verdict of simple assault, had to say that the loaded pistol being then and there fired was not a deadly weapon, being fired at a time when an assault was being committed. This court has no further use for the twelve gentlemen that were sitting upon that panel. They will be discharged.' Whereupon said motion to set aside said order was submitted to the court for decision, and the court denied the same, to which ruling defendant then and there excepted.

"That thereafter, and before the impaneling of the jury was begun, the defendant moved the court to direct the clerk to place in the jury-box the names of the twelve

persons mentioned in the order of October 14th, and offered in support of said motion the evidence heretofore set forth, which had been offered in support of the motion to vacate and set aside the order of October 14th, which motion was by the court denied, and to which ruling the defendant then and there duly excepted."

It must be conceded that this was a novel proceeding. Ordinarily, a court would not be justified in discharging a jury because it had returned a verdict which did not meet with the approval of the court. But the verdict might be such as to convince the court that the jury had purposely and willfully disregarded the evidence and returned a verdict in violation of their sworn duty. Under such circumstances the court would not only be justified in discharging the jurors, but it would be its duty to do so. The judge of the court below seems to have been of the opinion that the verdict returned in the case referred to was such as to justify the action taken, and in the absence of any showing to the contrary, we must presume in favor of the action of the court.

But the jurors discharged were not selected to try the defendant's case, nor were they selected to serve for any fixed term, as is shown by the order above set out. This being the case, the court had the undoubted right to discharge them, or any of them, at any time, without giving any reason for such discharge, and without the existence of any reason. The only difficulty apparent in this case is, that the jurors were discharged for what might under some circumstances be an insufficient reason. But as no reason was necessary, the fact that an insufficient one was assigned as the ground of the order can make no difference.

Again, conceding that the discharge of the jury was unwarranted, it does not appear that any injury resulted, or could have resulted, to the defendant by reason of such discharge. As the jury was not selected for the trial of his case, he had no vested right to a trial by such jury.

Another jury, by which he was tried, was ordered to be summoned, in precisely the same manner that the first one had been selected and summoned, viz., by the sheriff. It is not shown or claimed that the jurors thus selected were less favorable to the defendant than the jurors discharged would have been. As to these jurors all of his rights of challenge were preserved, and he has no just reason to complain. (*People* v. *Arceo*, 32 Cal. 40.)

The case of *Hildreth* v. *City of Troy*, 101 N. Y. 234, 54 Am. Rep. 686, relied upon by the defendant, differs materially from the one under consideration. There the jury had been selected under and in conformity to a statute of that state, which the court say made "elaborate provision for securing an impartial jury," and not by the sheriff, upon an open *venire*, as in this case, and the jury thus selected constituted the regular panel of jurors to try that particular case. Certain of the jurors were discharged by the court below on the erroneous ground that they were incompetent to sit as such jurors, by reason of the fact that they were tax-payers of the city of Troy, the city being a party to the suit. There was sufficient ground in that case, we think, for reversing the case, for the reason that the additional jurors were not selected as provided by the statute, but upon an open *venire* by the sheriff. By this means the party was deprived of the safeguards provided by the statute for procuring a fair and impartial trial. In this case, as we have seen, the defendant was deprived of no such right, and therefore the case is not in point.

It is further contended by the appellant that the court erred in admitting certain testimony offered by the respondent. The defendant had examined a certain witness in chief, and on cross-examination he was asked whether he did not make certain statements tending to show that he was friendly to the defendant and one Hubbard, a friend of the defendant, and that he would not tell anything that would hurt the defendant. The

witness denied having made the statements, and the person to whom he was claimed to have made them was called, and allowed, over the defendant's objection, to contradict the former witness, and to testify to the statements made by him.

It is insisted that the testimony was immaterial, and only tended to contradict the witness as to a collateral and immaterial matter. The evidence is not in the record, and for that reason we are unable to say whether the evidence was material or not. But if the witness had testified favorably to the defendant in his examination in chief, it was competent to show that he had made statements out of court tending to show his friendly feeling toward the defendant, and that he had expressed an intention to suppress facts within his knowledge that would injure the defendant's case. If this were not so, the evidence of the witness given in chief is not set out in the transcript, and we cannot know whether he had testified to any facts favorable to the defendant or not. If not, the testimony tending to impeach him was immaterial; but for the same reason that it was immaterial it must be held not to have been injurious to the defendant, because to impeach a witness who had testified to nothing favorable to him could work him no injury.

Certain instructions were asked by the defendant and refused, and this is complained of. But the instructions given by the court were very full, fairly presented the case to the jury, and covered the matters included in those refused.

In support of the motion for a new trial, it appeared that the jury, upon being sworn to try the case, were placed in charge of a bailiff and not allowed to separate; and the defendant offered to prove by the bailiff that while the jury was so in his charge, and during the trial, the jurors were allowed to and did read certain issues of the San Diego Union, a newspaper printed and published in the city where the trial was in progress, and

certain of the articles published in said issues of the
paper were offered for the purpose of showing that they
were calculated to influence the jury against the defend-
ant. The evidence was excluded. We set out in this
opinion some of the matter contained in the articles re-
ferred to.

## " ARE THERE ANY FLIES ON THE JURIES OF SAN DIEGO COUNTY ?

### "SOME IDEAS SUGGESTED BY THE RECORDS — A SUSPICION THAT THINGS ARE NOT WHAT THEY SHOULD BE — SOME OF THE FACTS ABOUT THE SUBJECT.

" Incident to the recent outrageous verdict in the
Towers case, a correspondent of the Union called atten-
tion to the fact that within the past few years there have
been numerous equally unaccountable findings by juries
in San Diego County, and it was suggested that if the
list of jurors were gone over, possibly there might be
found a thread running through which might be used as
a clew to the cause of such verdicts.

"Certain it is that within the last eight years public
sentiment has been strained and aroused to indignation
over the acquittal of more than one criminal, around
whom there had gathered evidence of guilt, until it
seemed nothing short of a violation of a juryman's duty
could possibly render a verdict exculpating the offender
from the consequences of his acts. Never, within
the history of the county, has capital punishment been
inflicted, and yet there have been committed crimes
as infamous and cold-blooded as ever stained the an-
nals of any municipality, and made a mockery of law.
Public sentiment, time and again aroused to indig-
nant remonstrance, but helpless under the miscarriage
of the established methods of administration of justice,
has suffered under repeated acquittals, or preposterously
inadequate verdicts, until more recent suspiciously inane

findings have called forth widespread and unanimously unfavorable comment.

"Have the juries who have sat in criminal and civil cases in San Diego County during the past few years been packed? Is it possible that in this vaunted county there has for years been practiced the most flagrant violation of the very first principles of the jury system as it had been so long honored?

"There is the incontrovertible evidence of the records to show that juries of the past four years, at the very least, have been composed, in part, of the same individuals. Does anything follow? Let the people draw their own inferences.

"Since 1881 there have come into the courts of this county thirty or more murder cases, many of them as utterly wanton and cold-blooded as were ever perpetrated. In all this criminal record there have been only *four* convictions, straight, on the information. There was, indeed, one infliction of capital punishment, in the case of a poor, friendless Indian. Upon one man the death sentence was pronounced, but never carried out, because he suicided. In seven straight-out murder cases the verdict of manslaughter was rendered, which in the crime of murder is about as heavy as the verdict of simple assault where a man shoots several times into a house full of women. In two cases of murder the records show that there appears to have been no disposition of these cases. The verdict in eight of these murder cases was a straight-out declaration 'not guilty.'

"What follows? The answer will be given to-morrow."

After stating that certain persons frequently appeared on juries in criminal cases, it is further said:—

"In 1888 the names of most of these men appear from three to eight times. In a city of thirty thousand people, why were the same jurors used over and over again? The law says that jurors shall be drawn from different parts of the county. Men have performed jury service

repeatedly whose known haunts are a certain saloon on Fifth Street. A *venire* is called and rapidly exhausted. Directions are issued to issue a special *venire.* Time is short; all parties in the suit are ready for trial. There is no time to search the county for jurors who have not before served. Certain men are known to be found in a certain resort,—henchmen of a high official; they must be taken care of, and two dollars and a half a day is good, average pay. Sabe? Mr. Juror is taken, notwithstanding he has already served from one to six times. He knows that by rendering verdicts in accordance with the desires of a certain high official he will be provided with a two-dollar-and-a-half-a-day job whenever opportunity offers, and that the opportunity will be created when possible. He becomes a professional juryman, and his verdict sometimes causes his fellow-citizens to enter an indignant protest, but, secure in the protection of certain well-known attorneys and high officials, he renders his verdicts and keeps his soft snap.

"These men appear mostly in murder cases and murderous assaults. Murders are declared to be manslaughter; assault and murderous assault, 'simple assaults,' —until the people have come to be hopeless of seeing justice meted out, and the punishment is rarely made to fit the crime."

The refusal to admit this testimony was error. A judge or juror who is called upon to sit in the trial of a case, especially where the life of the defendant is involved, should act calmly, deliberately, dispassionately. He should be governed entirely by the law and the evidence, uninfluenced by his own feelings, prejudices, or passions, or the passions or prejudices of others. But we cannot shut our eyes to the fact that the man who acts as judge or juror is but human, and is not always up to the ideal or legal standard of fairness and impartiality, and that improper influences will sometimes bring about improper and unjust verdicts. Therefore

it is always competent for a defendant, who has been convicted, to show, if he can, that the verdict rendered against him is the result of such improper influence. (*Farrer* v. *State*, 2 Ohio St. 54; 2 Graham and Waterman on New Trials, 484; *Walker* v. *State*, 37 Tex. 366.)

An attempt on the part of any person, whether through the medium of a newspaper or otherwise, to influence a jury by any improper means to bring in a verdict against a defendant is a palpable violation of his right to a fair and impartial trial, and if it appears to the court to have had such an effect, a new trial should be granted.

There can be no doubt as to the intention or palpable effect of the articles above set out. It was the clear intention of the publishers of this paper to intimidate the jury, and by abusing other jurors, who had returned verdicts of acquittal, to induce them to find the defendant guilty, and impose upon him the extreme penalty of the law. Whether they had that effect upon the jury or not was a question that the defendant had a right to have determined by the court on his motion for a new trial. The defendant should have been allowed to make the proof, with leave to the people to show, if possible, that these particular articles were not read by the jury, or if they were, that they were not in any way influenced by them. (*People* v. *Goldenson,* 76 Cal. 328, 353.)

The judgment is affirmed.

The order denying the defendant a new trial is reversed, with instructions to the court below to vacate the same and rehear the motion allowing the defendant to introduce the evidence excluded on the former hearing, and the people to rebut the same by other evidence, if it is desired.

Fox, J., and PATERSON, J., concurred.