## UNITED STATES v. MARRIN et al.

(District Court, E. D. Pennsylvania. March 3, 1908.)

### Nos. 44–46.

1. CRIMINAL LAW—FAILURE OF PROOF AND VARIANCE—MANNER OF RAISING QUESTIONS.

A failure of proof and a variance between the allegations and proof are questions properly raised by a motion for a new trial, and not by motion in arrest.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Criminal Law, § 2461.]

2. SAME—ARREST OF JUDGMENT—WHEN PROPER.

A criminal judgment will only be arrested for matter appearing of record which would render the judgment erroneous if given, the evidence being no part of the record for such purpose. The rule in civil cases that the matter alleged in arrest must be such as would have been sufficient upon demurrer to overturn the action or plea applies, also, to criminal cases.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Criminal Law, § 2423.]

3. SAME—NEW TRIAL—UNFAIR NEWSPAPER ARTICLES READ BY JURY.

Though one accused of conspiring to use the mails in carrying out a scheme to defraud would have been entitled to the withdrawal of a juror where it appeared that jurors had read newspaper articles charging him with having lived in luxury while a fugitive from justice; containing illustrations evidently intended to belittle and place him in a mean light before the jury and in the community; representing him as hardened and indifferent to the sufferings of his victims; referring to his associate's conviction of a similar offense, and asserting that accused was joined with him in the scheme to defraud, set forth in the case on trial and in others; connecting accused with alleged swindlers and criminals; referring to his demeanor in court in a contemptuous way; charging that his witnesses were of bad character, unreliable, "bartenders, bank cashiers, waiters,

and rounders of many types," etc.—he is not entitled to a new trial, he having directed his counsel not to insist upon the withdrawal of a juror, after an examination of the jurors as to whether they had read the articles, and having expressed a willingness to proceed with the trial.

4. POST OFFICE—UNLAWFUL USE OF MAILS—PROOF.

Where one was tried for conspiring to use the mails to carry out a scheme to defraud, under Rev. St. § 5440 [U. S. Comp. St. 1901. p. 3676], making it an offense to conspire to commit an offense against the United States, and under section 5480 [page 3696], making it an offense to use the mails to carry out a scheme to defraud, it was sufficient for the government to show that written or printed matter about the scheme charged was mailed to one of the three persons named in the indictment as the persons defendant planned to defraud, and that copies of the same printed matter was sent through the mails to a mailing list throughout the United States.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 40, Post Office, § 86.

Use of mails for frauds and counterfeiting, see note to Timmons v. United States, 30 C. C. A. 86.]

5. SAME.

In an indictment for conspiring to use the mails to carry out a scheme to defraud, under Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676], making it an offense against the United States, and under section 5480 [page 3696], making it an offense to use the mails to carry out a scheme to defraud, the names of as many persons defendant planned to defraud may be used in the indictment as the pleader may know, and all mail connected with the scheme, shown to have passed through the post office to any person whether named in the indictment or not, is evidence upon the question of the existence of the scheme.

6. CRIMINAL LAW—WRIT OF ERROR—PRESUMPTIONS.

Where, in a trial for conspiring to use the mails in carrying out a scheme to defraud, on an indictment charging a scheme to defraud named persons and others whose names were unknown to grand inquest, there was no showing that any other persons than those named were known to the grand inquest, it must be presumed on writ of error that the indictment in this regard truthfully states the fact.

7. POST OFFICE—CONSPIRACY—UNLAWFUL USE OF MAILS—EVIDENCE.

In a trial for conspiring to use the mails in carrying out a scheme to defraud, the cashbook, checks, and entries of cash in defendant's deposit book in a trust company, made during the continuance of the scheme, were properly admitted to show the conspiracy.

On Motion and Reasons for a New Trial.

J. Whitaker Thompson and John C. Swartley, for the United States.
V. Gilpin Robinson and John Creth Marsh, for defendant.

HOLLAND, District Judge. In this case, in due time after verdict, the defendant filed motions in arrest of judgment and for a new trial. Neither of the six reasons set forth in arrest of judgment raises any question which the court can consider on this motion. Both questions variously stated, to wit, a failure of proof and a variance between the allegata and probata, are questions properly raised by a motion for a new trial. After verdict, a judgment will only be arrested for matter appearing on any part of the record which would render the judgment erroneous, if given. The rule in civil cases "that the matter alleged in arrest of judgment must be such as would upon demurrer have been sufficient to overturn the action or plea" is the same and applicable in criminal cases. Wharton's Criminal Pleading & Practice (8th Ed.)

§ 759; Sadler's Criminal Procedure, § 516. The indictment and record of the trial can alone be considered, and the evidence is no part of the record for the purposes of passing upon a motion in arrest of judgment. Commonwealth v. Gurley, 45 Pa. 392; Commonwealth v. Kammerdiner, 165 Pa. 222, 30 Atl. 929; Commonwealth v. Newcomer, 49 Pa. 478. Thus the motion will be sustained when it appears from the record that the court is without jurisdiction, or that the act of Assembly on which the indictment is framed is unconstitutional, or that the indictment is insufficient, but not when a support of the reasons depends upon a reference to the evidence adduced. Such objections can only be raised on a motion for a new trial, and as they are involved in the reasons set up in this motion, we will pass to the consideration of the motion and reasons for a new trial. They are 61 in number, but they will be considered as summarized by counsel for the defendant at the argument.

First. "The newspaper accounts of the trial, as published in the North American, and read by the jury, were so unfair, distorted, and biased in favor of the government as to prejudice the defendant and deprive him of a fair trial." On the morning of September 23, 1907, the trial began, and the copies of the North American containing the offending matter were published and issued on the 23d, 24th, 25th, 26th, 27th, 28th, and 30th of September and the 1st, 2d, and 3d days of October. On the morning of the latter date, counsel for the defendant made a motion for the withdrawal of a juror, for the reasons above stated. The reports of the trial complained of, to say the least, were highly improper. They were calculated to hold the defendant up to contempt and create a prejudice in the mind of any person in whose hands a copy containing them might fall. They were not only highly sensational, but material portions of the evidence were distorted and some of the statements without foundation in fact. Reference is made to the fact that Marrin fled. This is repeated over and over again. The witnesses who testified narrated the same story in court that they had to the North American two years before. Great prominence was given to illustrations evidently intended to belittle the defendant and put him in a mean light before the jury and in the community. These illustrations were accompanied with comments representing the defendant as hardened and indifferent to the sufferings of the people who had been defrauded by him and his associates. The articles made repeated references to Francis as convicted of a similar offense and sentenced to the penitentiary, and the unqualified assertion is made that the defendant was joined with him in the scheme to defraud, set forth in the case on trial and in others. Reference is frequently made to Francis being brought from the penitentiary to testify. Illustrations show Francis and Marrin in conference, with special and prominent reference to them as "Partners Francis and Marrin conferring." He is connected with a number of other alleged swindlers and criminals, who it is said had been engaged in similar enterprises. He is charged with being a fugitive from justice, living in Paris in luxury with money received from the Storey Cotton Company. His demeanor in court and his manner upon the stand and his testimony are spoken of

in a contemptuous way. The witnesses called by him are said to be of bad character and unreliable; they are discredited by disparaging insinuations, in such statements as that "bartenders, bank cashiers, waiters, and rounders of many types were included in the collection of alibi witnesses called for the defense."

Following are some of the statements complained of:

"Marrin's trial comes directly as the consequence of charges made by the North American in the winter and spring of 1905 against the collection of swindlers, the chief of which was the Storey Cotton Company, and their nest, the Philadelphia Consolidated Stock Exchange, otherwise known as the 'Con Stock Exchange.' The revelations made by this newspaper were made daily for more than a month. At first the conspirators tried to brazen out the storm, their main refuge being in outcries against 'sensational journalism.' Finally Marrin fled, a receiver was appointed for the fraud, and the house of cards tumbled down upon the dupes who had builded it. Postal Inspector Dixon was removed as a result of the scandal which developed when a check made to him was found among the papers of the defunct company.

"Other Swindles Smashed.

"The North American having set the United States authorities on the trail of the Storey Cotton Company swindlers then turned its guns on the Provident Investment Bureau, and speedily closed up that swindle. Stanley Francis, its head, who was one of the principals in the Storey Cotton Company fraud, was caught, and after a desperate fight convicted and sentenced by Judge Holland to five years' imprisonment. The Supreme Court took a year from his sentence on the ground that the defendant had not been tried properly on one of the five charges against him. The North American then smashed the Haight & Freese bucket shop, and caused the 'Con' stock exchange to be banished from its quarters in the Bourse. Marrin was a fugitive for more than a year. He fled to Europe, where, with F. Ewart Storey and Thomas H. Quinlin and Sophie Beck, the woman head of the concern, and other members of the concern, he lived in luxury. He returned to this country and was arrested by Chief Postal Inspector Cortelyou in the Hotel Genessee, Buffalo, last November. Marrin was held under $25,000 bail by United States Commissioner Keating of Buffalo, but this was afterwards reduced to $10,000 by Judge McPherson."

On Wednesday, September 25, 1907, the headlines were as follows:

"Marrin's Letters to Storey Dupes Read to the Jury.

"Glittering Promises that Built up Swindle.

"New Alias Found.

"The Defendant Ran Branch Office as 'Stewart' is Sworn.

"Francis to Testify.

"Convict Will be Taken from the Penitentiary to Court.

"Seen at the Marrin Trial.

"Frank C. Marrin alias Stone, alias Harper, alias Stewart, wears a studied expression of bored indifference most of the time. Professor Thompson acted as the 'Judas' sheep for the herd of dupes—in New Jersey whom he led to the Storey Cotton Company's shambles. He will probably tell to the jury to-day the same shameful story he told to the North American more than two years ago. * * * Pathetic and realistic was the picture of despair and poverty made by the victims of the smashed swindle as they sat beside a long table, inside the bar enclosure, and selected from a heap of correspondence lying letters that had been received from the headquarters of the Storey Cotton Company. Irving S. Miller, a one-armed watchman, was one of these searchers. His grizzled head was held low to the table, while he held, one after the other, the envelopes in his teeth and took from them with his remaining hand the letters that had lured him to give his hard-earned savings

to the swindlers. \* \* \* He had put by $1,300 to provide for the needs of himself and his family in his old age. This money was swept away, before Marrin, Sophie Beck, and the rest of the gang fled to Paris where they lived in luxury. Stanley Francis was brought from his cell in the Eastern Penitentiary to confer with Marrin and defendant's counsel. \* \* \* Francis is evidently well supplied with money. He was fashionably dressed."

Stanley Francis, who at the time of the trial, was serving a sentence in the Eastern Penitentiary, did not appear as a witness in the case.

On October 2d the following appeared:

"Storey Cotton Co. Victims Helped Marrin Cut Big Dash at Races.

"Bet $30,000 at Once While Lambs were Being Sheared.

"Woman Warned.

"Witness for defense admits she told him to beware of Farrel. \* \* \*

"Farrel, of the many aliases, also told of this big bet and of others almost as large. He told also the names of the race horses owned by Marrin during this period. One of these was Lightning Tom, presumably named after Marrin's brother 'Tom,' said to be the fastest telegrapher in the country and the owner of the noted 'Marrin Pirate' wire, which supplies bucket shops and pool rooms throughout the country with quotations and race results. Others were Mollie Donohue, Daffy Down Dilly, and a score of others with names equally eccentric. Edward Marrin and Farrel testified that the Thomas Harper who posed as treasurer of the Storey swindle was 'Pat' Kearns, Marrin's brother-in-law. Bartenders, bank cashiers, waiters, and rounders of many types were included in the collection of alibi witnesses called by the defense."

It is very clear that the publication of such statements, comments, and illustrations tended to create a strong prejudice against the defendant, and to prevent a fair and impartial trial. Such treatment may be required in the preliminary stages of an effort of a daily paper to uncover some fraudulent scheme being practiced upon the public. It is no doubt a difficult and at times a perilous task to expose the vices and the vicious in public or private life, but very much greater are the difficulties and dangers which beset a journal in the work of driving out skillful swindlers entrenched behind schemes, which, upon their face, have all the appearance of fair business transactions, and who are armed with the power of wealth and position afforded by their ill-gotten gain; and when engaged in such commendable public service, being sure of its ground, the journal is no doubt justified in stating every fact and legitimate inference, either direct or remote, bearing upon the subject or relating to the parties in such vigorous manner and readable style as are best calculated to carry conviction. The whole life, the evil associates, other crimes past and present of the persons exposed, may be fused with the direct facts supporting the charge with all the skill and dash of the modern reporter and within the domain of truth, though highly colored, is not disapproved. But when the object is effected, and the party exposed is in court to defend against the crime charged, he is entitled to a fair and impartial trial, and this spirit of fairness of a generous people "never to strike when a man is down" has been carried into the law of the land in insisting upon an orderly and impartial administration of justice by a court and jury, even when the character of the defendant is bad, and he is charged with a most heinous offense of which conviction seems almost certain.

It has been well said by Judge McPherson, in the case of U. S. v. Odgen (D. C.) 105 Fed. 371, Id., 10 Pa. Dist. R. 1:

"Much may be permitted to the zeal of the press in detecting and exposing public wrongs. This is often very difficult work, and much freedom of expression is rightly allowed to those who are thus serving the public; but, after the preliminary stages have been passed and the inquiry has come before a court of law, it does serious harm to the cause of justice to pursue the prisoner with invective, or to interfere with his trial by usurping the proper functions of the judge and the jury."

In the following federal cases new trials were granted: U. S. v. Odgen, supra; Meyer v. Cadwalader (C. C.) 49 Fed. 32; Morse v. Montana Ore Purchasing Co. (C. C.) 105 Fed. 337; Mattox v. U. S., 146 U. S. 140, 13 Sup. Ct. 50, 36 L. Ed. 917. Pennsylvania Cases: Com. v. Landis, 12 Phila. (Pa.) 576; Com. v. Johnson, 5 Pa. Co. Ct. R. 236; Com. v. Jacques, 1 Dist. R. (Pa.) 287; Hasson v. Railroad, 21 Wkly. Notes Cas. (Pa.) 96. Other states: Cartwright v. State, 71 Miss. 82, 14 South. 526; State v. McCormick, 20 Wash. 94, 54 Pac. 764; People v. Murray, 85 Cal. 350, 24 Pac. 666; Walker & Black v. State, 37 Tex. 366; Carter v. State, 77 Tenn. (9 Lea) 440; People v. Stokes, 103 Cal. 193, 37 Pac. 207, 42 Am. St. Rep. 102; Farrer v. State, 2 Ohio St. 54.

But it needs no citation of authority to show that the defendant would have been entitled to the withdrawal of a juror in this case had he insisted upon the motion, but this he did not do. At the suggestion of his counsel, each one of the jurors was interrogated as to whether he had read the articles published in the papers in question, and while it appeared one of the jurors read all of them, and four read some of them, yet, as a result of the examination, the defendant directed his counsel not to insist upon his motion, and the latter stated to the court that his client had said to him "that in the face of the assurance that is given by the jury, he (the defendant) does not feel as if he ought to press for the withdrawal of a juror." With this statement, the motion to withdraw a juror was overruled. Thus, with knowledge of the effect which such publications must have in creating a prejudice against him, the defendant, a man of varied experience, and of more than ordinary intelligence, determined to take the chances of a verdict in his favor, and he is not now entitled to a new trial.

We do not insist that counsel is required to note what statements appear in the public press during the trial in which he is engaged, nor do we insist that he is required to at once bring it to the attention of the court when an objectionable publication appears. The performance of his duty at the trial and fidelity to his client require that his attention should be directed to a proper conduct of the case, and it would be, in our judgment, against public policy to charge him or his client with the knowledge of such publications during the trial. But when he is in possession of such knowledge during the trial, and appears in court with a motion for a withdrawal of a juror because of such publications, and is permitted to interrogate the jury, whose answers satisfy the defendant of their impartiality, and the defense expresses willingness to proceed with the trial, and so states to the court, he is not afterward

entitled to successfully attack a verdict against him upon the ground that the articles were prejudicial.

In the case of Com. v. Flanagan, 7 Watts & S. (Pa.) 419, on a conviction for murder, Justice Rogers for the Supreme Court said, in overruling a motion for a new trial:

"That great excitement should extensively prevail among the people in the vicinity, after the commission of so great an outrage, may be readily believed, without express proof of its existence; that it did exist, we have no reason to doubt: but that the state of feeling was unknown, either to the prisoners or their counsel, cannot be supposed without proof. Ample time was allowed by the court for consultation as to whether they would apply for a continuance, and also time to make the necessary preparation for the argument. It was with their own consent the cause was tried; and it is now too late, after taking the chance of an acquittal, to allege that as a reason for a new trial. Had a continuance been granted (and there is ground to believe it would not have been refused), the necessary measures might have been taken to change the venue to a neighboring county, where impartial justice would have been administered. In McCorkle v. Binns, 5 Binn. (Pa.) 340, 6 Am. Dec. 420, it is ruled that a party must not take the chance of a verdict in his favor, and keep a motion for a new trial in reserve. If the court should lend a ready ear to applications of this nature, causes will always be tried in the midst of the excitement, relying on that, in case of conviction, as a valid reason for a new trial. It would follow that, the greater the excitement and the more enormous the offense, the greater chance there will be of a final acquittal."

Second. The defendant was placed on trial under three indictments, charging a conspiracy to devise a scheme or artifice to defraud by use of the United States mail. Each of these indictments contained three counts, each count of each indictment alleging a conspiracy as to the same three persons "and others unknown," each count setting forth the same conspiracy, but alleging a different overt act. Thus indictment 44 in each of the three counts charges a scheme or artifice to defraud Heidenthall, Makely, and Eavey, by name, and "divers other persons whose names are to this grand inquest unknown," etc. These counts differ from each other only in the name of the person to whom the letter was mailed, which constitutes the overt act. In the first count the letter was alleged and proven to have been mailed to Heidenthall, in the second, to Makely, and in the third, to Eavey. The second and third counts were not pressed by the government because the mailing was not in either case proven, and the jury returned a verdict of "guilty on the first count in manner and form as he stands indicted, and not guilty as to the remaining counts thereof." It is now urged, "the government having failed to prove a conspiracy to defraud the three persons named in the indictment, the court erred in permitting evidence of a scheme to defraud the public generally." The defendant is not indicted for a scheme to defraud "three persons" and "others unknown," nor for using the United States mails in carrying out a scheme to defraud, but he is charged under section 5440, Rev. St. [U. S. Comp. St. 1901, p. 3676], with having conspired to commit an offense against the United States. It is true, the crime with which he is charged to have conspired to commit against the United States government is the crime forbidden by section 5480, Rev. St. [U. S. Comp. St. 1901, p. 3696], of "using the United States mails in carrying out a scheme or artifice to defraud." He who devises a scheme or artifice to defraud

intends to use it to defraud some particular person or persons, or any one of the general public who may be reached and entrapped, so that it may be said, and so charged, that the scheme was devised with intent to defraud any one with whom communication concerning it was had by mail.

The government, after proving the conspiracy to commit this offense against the United States, was required, in order that the conspiracy might be indictable, to prove an overt act on the part of one or more of the conspirators in carrying out the conspiracy to commit the offense against the United States. This crime against the United States was the use of its mails in carrying out the scheme to defraud, and it was, therefore, necessary for the government to allege in the indictment, and prove at the trial, that the defendant devised a scheme or artifice to defraud; used the mails; and either sent or received mail connected with the scheme. If he were indicted for committing a fraud, of course it would be necessary to name the persons defrauded, and proof of fraud committed upon others would be improper, but, as we have said, the crime with which he is charged to have conspired to commit against the United States is not to defraud any person or persons, but to use the mails in carrying out a scheme to defraud, and the persons communicated with through the mails are only important to identify and show the scheme. The names of as many may be used in the indictment as the pleader may know, and all mail connected with the scheme, shown to have passed through the post office to any person whether named in the indictment or not, is evidence for the jury upon the question of the existence of the scheme. The failure of the government to show a communication by mail with some of the persons named cannot be said to be a failure to prove the existence of the scheme to defraud so long as it has been shown, as in this case, that printed or written matter about the scheme charged was proven to have been sent by mail to at least one of the persons named, and that copies of the same printed and written matter relating to the alleged scheme was sent through the mails to a mailing list throughout the United States. The names of the persons to whom the communications were directed were not so important to the defendant in his defense as the subject-matter of the circulars and letters mailed on the question of the existence or nonexistence of the scheme. There was ample proof of its existence, and a failure to show a communication with two of the persons named is immaterial. There was no evidence to show that any other persons than the three named were known to the grand inquest, it is therefore presumed that the indictment in this regard truthfully states the fact. U. S. v. Riley (C. C.) 74 Fed. 210. What has been said as to the objection raised on indictment No. 44 will apply to similar reasons for a new trial set up under indictments Nos. 45 and 46.

Third. The cashbook, certain checks, and entries of cash in defendant's deposit book in a certain trust company made during the continuance of business of the Storey Cotton Company were offered in evidence by the government, and over defendant's objection were admitted, all of which are assigned as reasons for a new trial. All this evidence is so clearly relevant to show the conspiracy, the scheme, and the defendant's connection with both that a further discussion is un-

necessary. We are not convinced there was any error committed in the charge of the court. A re-examination shows the law was correctly stated, and the facts commented upon with fairness to both sides. The objections raised by the defendant to portions of the charge are without merit when the whole of it is considered in connection with the evidence.

For the reasons above given, the motion for a new trial is overruled, and a new trial is refused.