904

William Cohen, Detroit, Mich., on the brief, for appellant.

Philip A. Hart, Joseph C. Murphy and Vincent Fordell, Detroit, Mich., on the brief, for appellee.

Before MARTIN, McALLISTER and MILLER, Circuit Judges.

McALLISTER, Circuit Judge.

Appellant was indicted with two others and convicted of passing counterfeit money, and of conspiring to commit an offense against the United States. He appeals, claiming that there was insufficient evidence to sustain his conviction; that the court erred in admitting certain evidence and in refusing to grant appellant's requests to charge the jury; and that the court committed reversible error in the manner in which it conducted the questioning of jurors on their voir dire examination, as well as in failing to interrogate jurors as to their knowledge of a prejudicial newspaper account concerning the trial while it was in progress.

Appellant, on August 6, 1949, attended a so-called Mardi Gras festival at Marine City, a small town in Michigan, with two men who were also indicted. At a place known as Smitty's Grill, appellant paid for a round of drinks with a $10 bill, which was counterfeit. It appears that in making such payment, appellant held out a wad of bills to the bartender, who took the

$10 bill and returned change. The evidence further disclosed that the two other men passed counterfeit $20 bills at the same place, and that appellant accompanied them to other bars and stores where the two codefendants passed additional counterfeit $20 bills. Two counterfeit $10 bills were passed also at these other places, although it was not proved who had passed them. At the time of his arrest, upon being questioned, appellant denied he had passed the counterfeit $10 bill at Smitty's Grill, claiming that he had handed the bartender a genuine $50 bill instead. He also denied that he had been accompanied at Marine City by his codefendant, Meltzer, who had been identified by several people as being in the company of appellant, and as having passed several of the counterfeit $20 bills. Appellant later admitted he had been with Meltzer and explained that he had, at the time of his arrest, told a false story concerning this association, in order to protect Meltzer in some domestic complications which he was having with his wife.

■ It is true that the naked act of possessing and passing counterfeit money does not give rise to a legitimate inference of guilty knowledge. Price v. United States, 4 Cir., 70 F.2d 467. Knowledge or belief of the counterfeit character of the money is an essential element of the crime of passing counterfeit money; Zottarelli v. United States, 6 Cir., 20 F.2d 795; United States v. Carll, 105 U.S. 611, 26 L.Ed. 1135; and the evidence of such knowledge has to be proved beyond a reasonable doubt; Gallagher v. United States, 1 Cir., 144 F. 87. In this case, however, there is evidence of more than mere possession and the passing of the counterfeit money on the part of appellant and his association with others who possessed and passed such money. The circumstances surrounding the conduct of appellant on the day in question are pertinent. He, with his two codefendants, attended this annual affair known as the Mardi Gras at Marine City, where local clubs and organizations conducted various concessions, games of chance, a gambling hall, wheels of fortune, and similar concessions. The celebration attracted a large number of people. From 20,000 to 30,000 men, women, and children attended this affair in a town, the normal population of which was 5,000. It was, as the government observes, a most favorable occasion to engage in the passing of counterfeit money without the apprehension of detection. Appellant's statement that he had paid for the first round of drinks at Smitty's Grill with a genuine $50 bill was contradicted by testimony that he had paid with a counterfeit $10 bill; and the credibility of the conflicting testimony was for the jury. Appellant's denial at the time of his arrest that he was present in Marine City with his codefendant, Meltzer, could be considered by the jury as an attempt to conceal his association and relations during that entire day with the man who was identified as having passed several counterfeit $20 bills at a number of different places. With this background of circumstances, the fact that appellant passed a counterfeit bill in the company of two other men who passed counterfeit bills at the same place, and the fact that he was seen at numerous other places in company with his codefendants who were identified as having passed other counterfeit bills at such places could be taken into consideration by the jury in arriving at a conclusion whether appellant had passed the counterfeit bill with guilty knowledge; and the circumstances above related and the testimony of government witnesses constituted sufficient evidence upon which a verdict of guilt could be sustained.

■ We are also of the view that there was sufficient evidence to sustain appellant's conviction on the conspiracy count. As has been said, he passed a counterfeit note while he was with his codefendants who, in the same place, passed several other counterfeit notes; and appellant continued his association with the other men who kept on passing counterfeit notes in one place after another during the remainder of the day. This evidence of concert of action, together with appellant's denial that he had passed the counterfeit $10 bill, and his further denial that he had associated with one of the

codefendants during the day in question, permitted the jury to draw inferences of an unlawful plan or agreement in furtherance of a common design, and constituted evidence of the conspiracy charge. See United States v. Nelson, 7 Cir., 185 F.2d 758; United States v. Holt, 7 Cir., 108 F.2d 365. With respect to the admission in evidence of a statement of one of appellant's codefendants, such statement was properly admitted against the codefendant and explicitly limited by the district court in its admonition to the jury that it was not in any way to be considered evidence against appellant. Nor was it error to admit into evidence the two counterfeit $10 bills which were passed at certain of the concessions, although there was no proof as to who passed them; for it was clearly competent for the government to negative innocent intent by proof of repetitions of instances, including anonymous instances, of the occurrence of similar things in similar places. It is the repetition of the instances that tends to negative innocence of intent and the probability of coincidence. Carrullo v. United States, 8 Cir., 184 F.2d 743.

We come, then, to what appears to us to be the crucial questions in this case. The district court conducted the voir dire examination of the jurors under the provisions of Rule 24(a) of the Federal Rules of Criminal Procedure, 18 U.S.C.A. Counsel for appellant had prepared a list of questions to be asked the jurors by the court as to whether they had any information with respect to any of the defendants and whether they had formed any opinions as to them.[1] The particular questions requested evidenced careful preparation on the part of counsel. Be-

fore the jurors were called for the voir dire, the district court referred to this list of questions in the course of discussing the pertinence of certain of them. The following colloquy then took place:

"Mr. Fitzpatrick (Counsel for Appellant): Twenty-eight through thirty-three. I again urge, your Honor, that you ask each individual juror have they read about it, or heard about it from their friends or over the air. Have they heard these names or formed any opinions. That is the tenor of those questions, your Honor.

"The Court: Well, if you think they are important to you I will ask the question of each individual juror.

"Mr. Fitzpatrick: I submit they are most important, your Honor, in view of the factual situation with reference to at least two of these defendants who have been, or are on trial in other places. So then your Honor will ask twenty-eight through?

"The Court: I will repeat the names of the defendants and ask them if they have heard about their alleged law violation activities.

"Mr. Fitzpatrick: Now, your Honor, that is not in those questions. I would ask, your Honor, in making the request to follow the language of the questions, and not to ask the jury if they have heard of any illegal activities on the defendants' part.

"The Court: I said I would dramatize that a little bit so that you might have a little more time to think about it. * * * I might dramatize it a little bit more. I might say this case has been discussed in the newspapers,

1. The pertinent questions which counsel for defendants requested the court to ask the jurors were as follows:

28. Have you read anything about this case?

29. Have you heard, either over the radio or otherwise, about this case?

30. Have you recently read or heard anything about a case of the same nature recently prosecuted in the Federal Courts here against different defendants?

31. Have you within the past five months' read anything or heard anything

concerning individuals with the same family names as any or all of the defendants here? The family names of the defendants are Marson, Meltzer and Curlanis.

32. Have you recently read in the newpapers or otherwise or heard via radio or from any member of your family or from a friend or otherwise anything which would tend to cause you to form an opinion as to the guilt of any one or all of these defendants?

and in that connection not only with the Federal Court for the Eastern District of Michigan, but also the Recorder's Court, and you have a great opportunity to get some ideas about these defendants from reading the newspapers, if you haven't already read the newspapers."

Counsel for appellant immediately protested that this would be most prejudicial to his client, and in reply, the court said: "All right, I won't make that preliminary statement." Thereupon, the jury was called and returned to the jury box, and the following proceedings took place:

"The Court: I have asked you all collectively whether you had ever read or heard the names of Thomas Marson, Harry Meltzer, Witold Curlanis in connection with criminal activities.

"I will now repeat to you, Mrs. Mann, have you ever read anything in the newspapers about the alleged criminal activities of any of the named defendants?"

The juror so questioned replied that she had not, and had not heard their names on the radio or heard anything about them. The court then proceeded to question another juror who stated that if there had been anything in the papers about the defendants, he may have read it, but he didn't remember it.

"The Court: Now, just examine your memory and, of course, if you have read the names in the society column I don't suppose it would make much difference, but these questions relate to whether or not you have ever heard those names used in connection with criminal activity, or whether or not you read any so-called crime news in the newspapers about them."

The juror stated that he could not recall.

"Mr. Fitzpatrick: If your Honor please, I requested certain questions be asked. It wasn't my intention to ask whether or not the jurors had any knowledge of any alleged criminal activities of these defendants.

"There was a specific request—had they ever. Had they heard or read

recently of the family names of these defendants in the paper, or over the radio or from their friends.

"The Court: I had, prior to this last recess, asked the jurors whether they had ever heard the names of the defendants. They all responded that they had not. I take it that your repeated request that I ask the question which you have numbered from twenty-nine to thirty-three inclusive, you had reference to particular prosecutions or something of that kind?

"Mr. Fitzpatrick: I did not, of course, your Honor, and I am apprehensive that perhaps the jury might receive some impression from that to the contrary.

 *    *    *    *    *    *

"My objection, and I must make one to your Honor's question, is to your Honor's inquiry of the prospective juror: Have you heard of any alleged criminal activity upon the part of any one of these defendants?

"Your Honor, that wasn't the question and I respectfully submit, your Honor, that to ask it the way that question was asked is to create the impression with the juror of whom it was asked, or with another juror, that perhaps there was alleged criminal activity that she should have read about it and might have heard about it. That wasn't the question, your Honor."

Subsequently, the court, in effect, asked the questions previously submitted by counsel, and the response of the members of the jury was that they had not heard of anything that would tend to cause them to form an opinion as to the guilt of any or all of the defendants. Thereafter, counsel for defendant again brought the matter to the attention of the court. Mr. Fitzpatrick: "If it please the Court, there is this motion that I wish to make. I move at this time for your Honor to withdraw a juror and declare a mistrial for the reason of the prejudice that I feel necessarily ensued by reason of the question put by your Honor to one of the jurors, which question was substantially in this language, and I am sure your Honor can

get the language from the reporter. * * With reference to what the juror may have heard regarding,—and I think it is the language your Honor used: 'the alleged criminal activities of these defendants or any of them.'" The court denied the motion to withdraw a juror and proceeded with the trial of the case.

■ The above questions asked by the court were presumably for the purpose of protecting the rights of the defendants, and to detect any possible bias against them on the part of the prospective jurors. In other words, the court was acting in the place of defendants' counsel in making these inquiries. Defendants' counsel, in order to detect any such bias, had carefully prepared the questions which they would have asked the jury if they had been permitted to do so. In these proposed questions, they had, as was their right, and in the able and skillful performance of their duties, cautiously avoided any mention as to whether the jury had heard appellant's name "in connection with criminal activities" or had read anything in the newspapers about his "alleged criminal activities." Certainly, the last thing counsel wished to suggest was any connection of appellant with criminal activities. The court, then, interrogating the jurors for the purpose of insuring a fair trial for appellant, proceeded to ask the very questions which appellant's counsel were most emphatically insisting constituted prejudice to his right to a fair trial. Appellant was entitled to the presumption of innocence until his guilt was proven beyond a reasonable doubt. Any evidence introduced by the prosecution as to other "criminal activities" or "alleged criminal activities" on the part of appellant would have constituted reversible error, as nothing short of a conviction for

crime is admissible for the purpose of impeaching a defendant in a criminal trial. It has been held only recently by this court that the questioning of a defendant in a criminal case as to whether he has ever been arrested is prejudicial error. Pearson v. United States, 6 Cir., 192 F.2d 681. See also Henderson v. United States, 6 Cir., 202 F.2d 400.

■ We are of the opinion that the interrogation in question by the court in the face of the forceful objections of counsel for appellant, and in view of the fact that appellant's counsel had proposed proper questions which they requested the court to ask the jurors regarding their knowledge of the case, resulted in grave prejudice to appellant. For to ask whether the jurors had ever heard the name of appellant "in connection with criminal activities" suggested the association of his name with such activities.

The foregoing interrogation of the jury is also to be considered with another circumstance upon which appellant bases his claim that the judgment should be set aside for prejudicial reversible error.

During the course of the trial, an article appeared in the newspaper having the largest circulation of any journal in the city of Detroit, where the trial was being held. The article stated that the trial was bringing "standing-room-only crowds," and coupled the name of appellant with his two codefendants, Meltzer and Curlanis. It further stated that they were all charged with passing counterfeit money; that they were "equally indicted;" that Meltzer had previously been arrested for conspiring to kidnap, and was one of the few notorious hoodlums in Detroit, not then dead or behind bars; and that appellant, Meltzer, and Curlanis were "all holders of long police records." [2] Prompt-

2. The article follows:
    "Meltzer Trial Packs 'em in; Harry's a Big Shot at Last"
    "It looked this week as though Harry (Chink) Meltzer had achieved his 20-year-old desire to be a 'big shot.'
    "His trial on a half-dozen counterfeiting charges before Federal Judge Arthur F. Lederle has brought standing-room-only crowds to watch the Government's

fight to place him behind bars up to 80 years.
    "Meltzer, Victor Curlanis and Thomas Marson, all holders of long police records, are charged with passing nearly $600 in phony $20 bills at the Marine City Mardi Gras last August.
    "His reputation as a hoodlum, one of the few 'names' not now dead or behind bars, aroused the interest of Federal

ly after the newspaper article appeared, counsel asked the court to interrogate and poll the jurors as to whether they had read the article and whether prejudice had resulted from such reading. They also made a motion for a mistrial because of the prejudicial nature of the article. In reply to the request, the court stated that he felt the newspaper article, as well as two other similar articles, should be placed in the record, and that a formal motion should be made for a mistrial on the basis of the articles. The court stated, however, he did not know at that time what he would do about it. Counsel, accordingly, moved for a mistrial. The district judge then stated that he would have to leave that morning, within a few minutes, to attend a funeral; that the motions would be overruled at that stage of the proceedings; but that he would take the request for the inquiry of the jury under advisement. The jury then returned to the courtroom and, thereafter, a recess was taken so that the judge might attend the funeral. But he never got back to the point and made no further inquiry as to whether the jurors had read the article or whether any of them might have been influenced by it.

A motion for a mistrial is addressed to the sound discretion of the trial judge, and whether it should be granted depends upon all of the circumstances in the case. United States v. Carruthers, 7 Cir., 152 F.2d 512. In the foregoing case, it was held that a newspaper publication could, under certain circumstances, bring to naught, because of the necessity of granting a motion for a mistrial, a long, tedious, and expensive trial. However, in that case, the trial court had inquired of the jury whether they had read the prejudicial newspaper article in question. Eleven jurors replied that they had not, and the twelfth, who stated that he had read "something" in the paper, couldn't remember anything more than that the article concerned a purely legal question about a motion which had been made. In Stunz v. United States, 8 Cir., 27 F.2d 575, the court, while holding that a certain newspaper article could not have been said to prejudice or influence a person of reasonable intelligence, stated that it recognized, however, that the circumstances of a case might be such that a newspaper account would render a fair trial impossible

In King v. United States, 6 Cir., 25 F.2d 242, 244, it appeared that on the afternoon on which the jury was charged in the course of a criminal trial, the defendant had been arrested on the charge of being a fugitive from justice from another state, and the fact received publicity in the only

Building workers and law students. Though equally indicted, Marson and Curlanis do not have the dubious glamor that surrounds Meltzer · when he is on trial.

"Another Trial Due"
"Regardless of the outcome of this case, he also must face trial for the dynamiting of a Big Bear Market. He was unable to make either the $10,000 Federal Bond or the $25,000 bond in the latter case.

"The former Northern High School boxer first introduced himself to the public in June, 1930, with a statement, 'I thought we'd be big shots.' That was when he and a half-dozen other teenagers were arrested in a conspiracy to kidnap a land broker.

"The charge was dismissed.

"Meltzer said then, 'It was · silly and foolish. I'm supporting my folks and I've never been in trouble before.'

"Made Up For Lost Time"
"But he got into trouble many times after that and soon police took to looking for Meltzer whenever trouble broke. He was never convicted of anything serious. But he gained a reputation.

"Sitting in the courtroom, wearing a blue suit and the same disinterested look each day, he occasionally whispers information to his attorney, William G. Fitzpatrick, or smiles at the ten women and two men on the jury.

"Meltzer's first blush occurred last Friday when Mrs. Bertha C. Guy, Marine City clubwoman, testified that he had given her a $20 bill, later proved counterfeit, for a 50-cent bolero-type vest. She gave him $19.50 in good money as change, she said. Meltzer, a snappy dresser and big spender, smiled sheepishly.

"The Government's case, being presented by Asst. U. S. Attorneys Joseph C. Murphy and Ward Kemp, resumes Wednesday."

morning newspaper published in the city in which the trial was taking place. The court, in its recitals, went on to say that the newspaper article itself merely stated the fact of the arrest and the giving of a bond, which facts, however, could not have been admitted in evidence, and may have been prejudicial in the eyes of the jury. A motion for a mistrial was filed before the return of the verdict, although it did not appear from the record whether it was specifically called to the attention of the court, or what action was taken thereon by the court. Judge Hickenlooper, speaking for this court in the cited case, however, declared: "If properly called to the attention of the court, denied by the court, and exception to such ruling duly reserved, such action might very properly constitute error. U. S. v. Marrin, D.C.Pa., 159 F. 767; Mattox v. U. S., 146 U.S. 140, 150, 13 S.Ct. 50, 36 L.Ed. 917; Harrison v. U. S., [6 Cir.], 200 F. 662. If called to the attention of the court, however, inquiry made of the jury as to whether the article had been read, and the jury clearly and emphatically cautioned against allowing such article to influence their verdict, it is at least doubtful whether failure to declare a mistrial would constitute error." In the King case, it is implicit that in circumstances such as appear in the case before us, the trial court, upon its attention being called to the publication of a prejudicial newspaper article during the course of the trial, should make inquiry of the jury as to whether they had read the article, and clearly and emphatically caution it against allowing it to influence their verdict; and the case of Stunz v. United States, supra, is authority for the rule that the publication of a newspaper article may be so prejudicial that, in spite of the caution of the trial court, a fair trial would be thereby rendered impossible, and a motion for mistrial must be granted.

■ Upon the showing of appellant's counsel, it was the duty of the court to interrogate the members of the jury to ascertain whether they had seen the newspaper article and, if so, whether it had created any prejudice in their minds. If they had, as a result of reading the article, come to the conclusion that appellant was a criminal with a long-time police record and an old associate of another hardened criminal, it would have clearly been prejudicial.[3] The foregoing must be considered in conjunction with the voir dire examination. These two circumstances may well have been the determining factors in the verdict of the jury as to appellant's guilt. Marson had been a businessman in this community. Prior to 1948, he had been associated in operating a stamping, welding, and machine plant, employing 100 men, at Algonac, which was about seven miles from Marine City. His mother, his brother, and his two sisters, with their families, live in the vicinity of Marine City. After appellant sold his interest in the Algonac business, he acquired the patent rights of a plastic combination known as Brickote, a material of simulated brick for application to the outside of frame houses, still retains such rights in New Jersey, New York, and California, and had a company in Buffalo, New York, and worked there in such business. He was also the organizer of the Down-River Baseball League, of which Marine City was a part, and he had been interested in supporting athletic activities in that locality since his younger days when he had attended school in nearby Fairhaven. He was well known by many people at Marine City and knew various proprietors, bartenders, waitresses, and members of the community in the places he visited on the day in question and where the counterfeit money was passed. It appears that appellant was drinking heavily all during the day and past midnight

3. As far as the evidence in the case goes, it appears that appellant was never arrested, or convicted of the commission of any crime or misdemeanor, and that the nearest approach to any such thing which the government—treading on thin ice—brought out was that appellant had once been committed by a state court to jail for a period of sixty days for contempt during a grand jury investigation of gambling, and that subsequently the circuit judge discharged him after three days of such detention.

during the time that he was in the company of his codefendants. These circumstances might reasonably and plausibly account for his presence and conduct in Marine City on the day in question, and might tend to remove suspicion that he had deliberately chosen a crowded festive town as a place where it would be easy for him to pass counterfeit money. Moreover, such circumstances would give color to counsel's argument of the unlikelihood of appellant's knowingly passing counterfeit money in places where he was known and to persons with whom he was well acquainted. It was the evidence of appellant's giving a single counterfeit $10 bill in payment of drinks, and his association, while drinking heavily, with his codefendants on occasions when they passed other counterfeit bills, upon which the government chiefly relied, and on proof of which appellant was convicted and sentenced to fifteen years in prison, and to pay a fine of $15,000. Of course, the facts were for the jury, but the tendency of appellant's evidence to show lack of complicity on his part may well have been destroyed by the above mentioned prejudicial circumstances. It is our conclusion that the failure to interrogate the jurors as to the newspaper article, taken in conjunction with the prejudice resulting from the voir dire examination, constitutes reversible error.

As to the claimed error with respect to the failure to give appellant's requests to charge either in the language proposed or in substance, it appears that the district court was furnished the proposed requests late in the trial proceedings, and after the conclusion of the proofs; see Rule 30 of the Federal Rules of Criminal Procedure; United States v. Olweiss, 2 Cir., 138 F.2d 798. It should, however, be observed that such delay was excusable because of the illness of counsel on the evening before the case went to the jury. With respect to a charge on the theory relied upon, it is the law that where a defendant in a criminal case presents a theory supported by the evidence, and the court's attention is particularly directed to it, it is reversible error to refuse to give a charge on such a theory. No complaint on the score of failure to give requested instructions is likely on retrial. It may here be observed that the purpose of Rule 30 was to give the trial court the opportunity to present the case to the jury with complete fairness to the parties and after full consideration of their claims as to their theories, the law, and the facts applicable. In many instances, and especially in complicated cases, it is obvious that the more time the court has for the consideration of the proposed requests, the more fully it may present them to the jury. Under the circumstances of this case, we feel that no justifiable complaint can be advanced against the charge as given by the district court.

In accordance with the views above expressed, the judgment is reversed, and the case remanded to the district court for a new trial.

United States Court of Appeals
Sixth Circuit.