**UNITED STATES of America**

v.

**Gerald SCHALL a/k/a Calvin Wendy et al.**

**Crim. A. No. 72–259.**

United States District Court,
W. D. Pennsylvania.

Feb. 1, 1974.

Richard L. Thornburgh, U. S. Atty., Pittsburgh, Pa., for plaintiff.

Allen N. Brunwasser, David J. Kozma, Pittsburgh, Pa., for defendants.

## OPINION AND DECREE

SNYDER, District Judge.

On December 7, 1973, after Non-Jury Trial, the three Defendants were found guilty (in a lengthy Opinion and Decree) of twenty-six counts of Mail Fraud, on an Indictment which originally contained sixty counts against ten defendants.[1] This Court pursuant to a Request for Specific Findings filed an Opinion which set forth the basis for the finding of guilt, as well as for the dismissal of numerous counts where the Court concluded, as a matter of law, that use of the mails had not been proven by the requisite degree of proof.

The substance of the scheme charged against the Defendants was that through certain home repair companies, homeowners were induced to enter into agreements for the repair and improvement of their residences. Upon the execution of contracts usually calling for installment financed payments, the Defendants would furnish coupon books to the homeowners showing the indebtedness payable to home repair companies or financing companies controlled by the Defendants. At the same time, it was charged, the Defendants would draft home improvement contracts on Associated Town "N" Country Builders (Associated) paper which would contain false information concerning the identity of the debtor and the type and cost of the improvements. The Defendants would then fraudulently affix thereto the signature of the homeowner who had contracted for the original improvement and Associated paper would be presented to Homemakers Loan and Consumer Discount Company (Homemakers), a subsidiary of General Electric Credit Corporation (G. E. Credit), for the purpose of inducing G. E. Credit to purchase these obligations and remit the proceeds to the Defendants. The mastermind of this scheme was alleged to be Gerald Schall. Michael Nikolich, an employee of G. E.

---

1. One of the original defendants pled prior to trial. One was dismissed prior to trial and five others were dismissed during the course of the trial.

Credit, was charged with manipulating the purchase of contracts, knowing them to be false, and then transmitting the proceeds to Gerald Schall. Theodore Torbich was alleged to be involved by going to the homeowners and doing unnecessary work on their furnaces, by intercepting coupon books evidencing the financing of the contracts through G. E. Credit (with whom the homeowners had no contact whatsoever), and by delivering a large portion of the proceeds of these loans to Schall from Homemakers by way of Associated.

Without attempting to summarize the thirty-four page Opinion filed at the conclusion of the trial, suffice it to say that the testimony received in the three weeks of trial substantiated beyond a reasonable doubt that the home improvement contracts which existed on the records of G. E. Credit were substantially larger than any contracts authorized by the homeowners and in not a single instance did the homeowners know anything about the fact that Associated was in any way connected with the transaction. G. E. Credit's books even showed some collections of monthly payments on accounts from homeowners (a lulling technique) who testified that they had never made any payments to G. E. Credit and that they were completely unaware of even the existence of such loans.

It was clear that Homemakers regularly processed their accounts and contracts (including the contracts of Associated) through a computer center in Canton, Ohio. The mailing counts of the Indictment were in pairs; that is, for each alleged fraudulent contract the odd numbered count represented the mailing of a contract from the office in Monroeville, where it was discounted, to G. E. Credit in Canton, Ohio, the processing center; and the second or even numbered counts represented the subsequent mailing from Canton, Ohio of a payment book directly to the homeowner in the Pittsburgh area.

The convicted Defendants have now filed Motions for Judgment of Acquittal and for a New Trial. In our opinion the Motions must be denied. We consider *seriatim* the grounds for a new trial raised by Defendants which we have attempted to distill from the thirty-three paragraphs of the Motion (Appendix to this Opinion) many of which are repetitious:

(1) The Opinion and Decree did not comply with Rule 23(c) of the Federal Rules of Criminal Procedure because the findings made are clearly erroneous and are not sufficiently set forth to indicate the guilt of the Defendants as to each count. (Paragraphs 1, 6, 7, 13, 19, 20 and 33 of the Motion).

(2) The Court erred in not suppressing in-court identification of some of the Defendants because of alleged improper out of court use of photographs. (Paragraph 2 of the Motion).

(3) The Court erred in not granting an Evidentiary Hearing in regard to an alleged inspection by the Court of the Jencks statements. (Paragraph 3 of the Motion).

(4) The Court erred in not holding an Evidentiary Hearing concerning information which reached the Court of the alleged intention of one of the Defendants toward the end of the case to enter into plea bargaining. (Paragraph 4 of the Motion).

(5) The Court erred in permitting evidence of dealings with Homemakers Loan and Consumer Discount Company when the Indictment alleged General Electric Credit Corporation as being the party defrauded. (Paragraph 11 of the Motion).

(6) The Court erred in finding that the trial evidence justified that the mails were to be used as part of the scheme to defraud. (Paragraphs 5, 6, 7, 8, 10 and 15 of the Motion).

(7) The Court erred in permitting numerous counts to be tried when only one crime was involved, i. e., the prosecution split one scheme of mail fraud into sixty criminal acts. (Paragraphs 1, 9 and 17 of the Motion).

(8) The Court erred in considering the three Defendants as jointly responsible for the activities of the others when no conspiracy count was involved nor was any aiding and abetting involved. (Paragraphs 9 and 28 of the Motion).

(9) The Court erred in interpreting the testimony of the various named witnesses and in the weight to be given to their testimony. (Paragraphs 23, 24, 25, 26, 27, 29, 30, 31 and 32 of the Motion).

(10) Finally, we also consider the Defendants' contentions that they are entitled to Judgments of Acquittal because the verdicts were against the weight and sufficiency of the evidence and that the interests of justice require a new trial.

## I. SPECIFIC FINDINGS OF THE COURT IN COMPLIANCE WITH RULE 23(c) F.R.CR.P.

Defendants assert that the Court's Opinion and Decree did not comply with Federal Rule of Criminal Procedure 23(c) because the Findings and Conclusions were not sufficiently specific.

At the time of the filing of the original Opinion and Decree in this case, this Court had carefully reviewed the Opinion of the Third Circuit by Chief Judge Seitz in the case of United States v. Livingston, 459 F.2d 797 at page 798 (3rd Cir. 1972) in which the following appears:

"Findings of fact in non-jury criminal cases primarily aid the defendant in preserving questions for appeal and aid the appellate court in delineating the factual bases on which the trial court's decision rested. See 8 Moore's Federal Practice (Cipes, 2d ed.), Para. 23.05. Indeed, it has been suggested that findings under Rule 23(c) are a prerequisite to preserving for appeal issues concerning the significance or existence of a particular fact. See Wilson v. United States, 250 F.2d 312, 325 (9th Cir. 1957); Cesario v. United States, 200 F.2d 232, 233 (1st Cir. 1950). Findings of fact are essential to proper appellate review of a convic-

tion resulting from a non-jury trial. This was an important consideration when the present text of Rule 23(c) was promulgated, altering pre-existing law and *requiring* the trial judge to make special findings, if requested. See Barron & Holtzoff, Federal Prac. & Proc., § 2124 (Rules ed.). Compare United States v. Weber, 437 F.2d 1218, 1221 (7th Cir. 1971) with Lofland v. United States, 357 F.2d 472, 477 (9th Cir. 1966). Rule 23(c) entitled the defendant to request and receive special findings. Howard v. United States, 423 F.2d 1102, 1104 (9th Cir. 1970)." (Emphasis added)

In particular, this Court approached the innocence or guilt of these Defendants with the mandate of our Circuit in mind as expressed in United States v. Dreer, 457 F.2d 31 (3rd Cir. 1972), where Circuit Judge Biggs in commenting upon mail fraud stated the following (at Page 33):

"This crime against the United States . . . [is] the use of its mails in carrying out the scheme to defraud, and it was, therefore, necessary for the government to allege in the indictment, and prove at the trial, that the defendant devised a scheme or artifice to defraud; used the mails; and either sent or received mail connected with the scheme." (Portion of a quote from United States v. Marrin, 159 F. 767, 774 (E.D.Pa.1908), affirmed 167 F. 951 (3rd Cir. 1909).

The scope of the crime of Mail Fraud is an extremely broad one and the government ordinarily need prove only (1) the intention of devising a scheme to defraud, and (2) the use of the mails in its furtherance. Pereira v. United States, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954); Kann v. United States, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944). The scheme is one to defraud if it is reasonably calculated to deceive persons of ordinary prudence and comprehension. Silverman v. United States, 213 F.2d 405 (5th Cir. 1954), cert. denied 348 U.S. 828, 75 S.Ct. 46, 99 L.Ed.

653; Gusow v. United States, 347 F.2d 755 (10th Cir. 1965).

In this case there was a detailed analysis of the findings on which the Court was satisfied beyond a reasonable doubt that a scheme to defraud had been intentionally devised. The testimony of the victims was analyzed in detail showing that the homeowners' contracts were entirely different than the contracts finally transmitted through Associated Town "N" Country to Homemakers Loan and Consumer Discount, and subsequently discounted by Homemakers. The relationship between Associated Town "N" Country Builders, through Irwin Holtzman, and the Defendants Nikolich, Schall and Torbich, showed the use of Associated Town "N" Country as the "go between" in carrying out the scheme. The results of the scheme, in terms of money resulting from the fraud, were traced into either the hands of Gerald Schall directly or to companies operated by him. In total this amounted to $59,238.00 under the credible evidence. The original Opinion pointed out the identification made by each one of the homeowner-victims.

Particularly damaging to the Defendant's contentions was the testimony of Charles Celona, at one time employed by Gerald Schall. His testimony established the nature of the fraud by way of falsified home improvement contracts, the relationship of Torbich to the entire scheme, the transmittal of the money from Nikolich at Homemakers Loan and Consumer Discount to Associated Town "N" Country to Gerald Schall. Basically, he outlined the entire fraudulent scheme and the method of its operation. His testimony, in light of all of the other exhibits and the testimony of other witnesses, was entirely credible and persuasive.

Another former employee of Gerald Schall, John Fitchwell, identified Schall's association with various companies known as Peoples Service Gas Heating Company, Keystone Roofing and Remodeling Company, and the various other names used by Gerald Schall in his contacts with the victims. In particular, Mr. Fitchwell outlined the association between Schall and Nikolich and stated that Schall had indicated that he had "Nikolich in his back pocket".

Under the testimony of Irwin Holtzman, President and Owner of Associated Town "N" Country Builders, the results of the contracts, which were brokered in the name of Associated Town "N" Country, involved only a commission payment to Associated with all the rest of the proceeds delivered to Gerald Schall. Thus, the findings of the Court clearly showed the entire nature of the scheme to defraud, and further that the scheme was widespread as evidenced by the number of victims and the similarity of the operation and results of the scheme with respect to each of the victims.

The Court analyzed at great length the elements of the use of the mails and made specific findings with respect thereto on each count of the Indictment, as will be discussed more thoroughly in a subsequent point involving mailing. The law is clear that it is the use of the mails in connection with the scheme when the use of the mails follows in the ordinary course of business. While it is true that the Government's proof did not show that the Defendants mailed anything, there was certainly mailing caused to be done in carrying out the scheme. The Supreme Court of the United States covered this situation in its Opinion in Pereira v. United States, *supra*, where it stated:

> "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, *or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used.*" (Emphasis added.)

See also to the same effect: United States v. Masters, 456 F.2d 1060 (9th Cir. 1972); United States v. Strauss, 452 F.2d 375 (7th Cir. 1971). The Opinion of this Court fully complied with the requirements of the Federal

Rules of Criminal Procedure by which there were preserved to the Defendants the issues concerning all of the matters on which the Defendants were found guilty. United States v. Livingston, 459 F.2d 797 (3rd Cir. 1972); Howard v. United States, 423 F.2d 1102 (9th Cir. 1970).

## II. ADMISSIBILITY OF IDENTIFICATION TESTIMONY

■ The Defendant, Gerald Schall, had filed a Motion to Suppress certain identification testimony as tainted by out of court photographic identifications. A hearing on the matter was held by Judge Joseph F. Weis, Jr. (at that time a Member of this Court but now a Member of the Third Circuit Court of Appeals). After hearing the testimony of the Postal Inspectors, who were extensively cross-examined, Judge Weis found that the methods employed by the Inspectors were not unduly suggestive and that the identification testimony based on the photographs should not be suppressed on that basis.

During the trial itself, this matter was also thoroughly explored as to each witness who had been shown photographs and each time was disposed of by this Court as not being subject to suppression.

From an examination of the record it is disclosed that the Government established by "clear and convincing evidence" that identifications were not influenced by exposure of the witnesses to photographs but were independently based on each witness' recollection of the identity of that particular Defendant and his involvement in the perpetration of the offense. Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L. Ed.2d 1247 (1968); United States v. Thomas, 469 F.2d 258 (3rd Cir. 1972); United States v. Shannon, 424 F.2d 476 (3rd Cir. 1970). The evidence in this case is replete with identification of the Defendants based independently of any suggestive use of photographs. United States ex rel. Oliver v. Commonwealth of Pennsylvania, 468 F.2d 908 (3rd Cir. 1972); United States v. Rohland, 468 F.2d 238 (3rd Cir. 1972).

As none of the out of court identification was unduly suggestive to the witnesses who were very positive in their in court identification, we do not believe that the matter requires any further discussion.

## III. HANDLING OF JENCKS MATERIAL

■ Counsel for the Defendants take exception to the handling of certain *Jencks* material. While no place is pointed to in the record nor is the matter to which objection is taken specifically pointed out and for that reason alone could be summarily refused, the Court, nevertheless, has searched the records for any possible mishandling of this material and is satisfied that no error has been shown.

At one time on Friday, June 15, 1973, after the Court permitted the case to proceed non-jury and after numerous requests by Mr. Allen Brunwasser as counsel for Gerald Schall that he was not receiving the *Jencks* material on time, and further after additional requests by the Court that, if at all possible, the *Jencks* material be made available to counsel at least twenty-four hours prior to the calling of each particular witness, the Assistant United States Attorney indicated the order in which the witnesses were going to be called. (Tr. p. 667). In addition, on Monday, June 18th (the next scheduled trial day after Friday was Tuesday, June 19th) a letter was sent by the Assistant U. S. Attorney to Defense Counsel along with a copy of all of the *Jencks* material. A copy of this letter together with a copy of the statements was also sent to the Court. Originally when statements were handed to counsel, a copy would be given to the Court. This was done so that if the Court during the cross-examination would have occasion to refer to the statements it could be done without having to interrupt the flow of testimony

(for example, Tr. p. 667). This, of course, was known to Counsel for the Defendants and so appears on the record.

When a Mrs. Rogers was called on Tuesday, June 19, 1973, the Clerk handed to the Court the letter of June 18th containing the copies of the *Jencks* material of not only that witness but of the other witnesses as well which had been sent along with the letter. The Court did not examine these statements. When the Court went to pick up the statement of Mrs. Rogers, as shown by the record (Tr. p. 1025), Counsel for the Defendants, Mr. Brunwasser, indicated that he had received the letter of June 18th and noted that a copy was sent to the Judge. The matter was set forth on the record (Tr. p. 1026) including the fact that the Court had not examined the *Jencks* material in any way and had neither looked at the statements nor referred to them for any purpose. In order to protect the rights of Mr. Brunwasser's clients, the letter together with all of the exhibits was requested to be given to Counsel for the Defendants who refused to accept them (Tr. p. 1027). Further, to protect the record the letter was read into the record and made a part of the same (Tr. p. 1029), and the letter together with all of the exhibits was placed in an envelope and marked "Impounded in connection with the records of this case". With full knowledge and realization of the statements made by this Court, Counsel for the Defendants requested an evidentiary hearing on whether or not the Court had examined the statement of the witness which had not been admitted in evidence and which had not been made the subject of cross-examination by Defense Counsel. In addition, Defense Counsel requested a mistrial. The Motion for Evidentiary Hearing was denied and the Motion for Mistrial was denied as well. (Tr. p. 1034).

At this time we must point out that the trial had begun on June 11, 1973, and the record will indicate the vast number of objections made by Defense Counsel which required the Court's immediate attention. In an effort to keep the trial moving along, copies of the *Jencks* material were requested to be made available to the Court when and if any matters arose concerning such on cross-examination. In as much as this Court did not examine the *Jencks* material in any way nor come to any conclusion whatsoever in this case based thereon, it is inconceivable that it would have in any way prejudiced the Defendants or their Counsel. The testimony in the case points clearly to the guilt of the Defendants and they could not have been prejudiced in any way by any handling of the *Jencks* material in those portions of the record referred to above. There was certainly no basis for any evidentiary hearing in this situation.

## IV. INCIDENT INVOLVING PLEA BARGAINING

Counsel for the Defendants have claimed that the Trial Judge erred in not holding an evidentiary hearing concerning an interview with Michael Nikolich.

Counsel for the Defendants have objected to the Court's handling of information that one of the Defendants wanted to enter into plea bargaining. It is necessary to refer to the record in order to understand exactly what occurred. The case was concluded on Friday, June 29th and at that time, Counsel for the Defendants in addition to making a Motion for a Directed Verdict which was denied, also made a Motion for an Evidentiary Hearing. (Tr. p. 1674). The basis of Counsel's Motion was that at Noon on the day before, i. e. Thursday, June 28th, Counsel for the Defendants discovered the Assistant U. S. Attorney in the Judge's Chambers and "I believe has disclosed to Your Honor that Mr. Nikolich will be (was?) interviewed by him in his office without my presence and at that time had indicated that he was guilty and desired to so plead."

The Court immediately corrected the record to show that at Noon on the pre-

vious day Mr. Seif, the Assistant U. S. Attorney, had come to the Court to report that Mr. Nikolich wanted to do some plea bargaining and that, at that point, Mr. Seif had told him that he could not possibly interview him and that anything that he [Nikolich] wanted to do would have to be done through his counsel [Brunwasser]. The Assistant U. S. Attorney promptly and quite properly reported this to the Court. Counsel for the Defendants was sent for immediately and was notified exactly what had occurred and informed that the matter would not be considered further by the Court, unless or until Counsel for the Defendants presented something additional to the Court. This was all made a matter of record and this Court is satisfied that there was no other way to handle the matter under all of the circumstances and, certainly, that it was handled in a way that caused no prejudice of any kind to any of the Defendants. It is noteworthy that Counsel for the Defendants does not indicate any disagreement whatsoever with the Court's statement of the entire occurrence except for the fact that somehow or other the Court learned that one of the Defendants wanted to do some plea bargaining. This Court recognizes, having been involved with the Law for over thirty years, that considerable restraint must, at all times, be exercised by the Court. In light of the Motions made by Counsel for the Defendants and considering what actually occurred, we cannot see that prejudice of any kind was caused to the Defendants by the Court's refusal of the Motion for Evidentiary Hearing at the conclusion of the testimony.

## V. VARIANCE OF PROOF AND THE INDICTMENT

■ The Indictment in this case charged the Defendants with devising a scheme to defraud the General Electric Credit Corporation through the use of fraudulent home improvement installment contracts by which the Defendants obtained large amounts of money. As was previously indicated, the testimony generally showed that the fraudulent home improvement contracts were forged on paper of Associated Town "N" Country Builders and taken to the Monroeville Office of Homemakers Loan and Consumer Discount Company where they were financed.

The testimony revealed that Homemakers was the *wholly owned subsidiary* of General Electric Credit Corporation and both Mr. Rounsavell, the Auditor of General Electric Credit, and Mr. Spivey, the Manager of General Electric's Computer Center, affirmed the relationship of Homemakers Loan and Consumer Discount Company with General Electric Credit Corporation. Defense Counsel throughout the trial objected to the variance between the Indictment, which involved only General Electric Credit Corporation, and the evidence, which constantly connected Homemakers with the contracts.

As this Court sees it, the exact issue involved here has been decided adversely to the Defendants by the decision of United States v. Dreer, 457 F.2d 31 (3rd Cir. 1972). In that case, Dreer was found guilty on six counts of an indictment alleging mail fraud. The substance of the charge was that Dreer "doing business as Terminal Warehouse Company, a moving company, with intent to defraud, discounted spurious invoices to one Sol Goldstein". The purported invoices were for transportation of goods and household furnishings of Members of the Armed Forces. It was then alleged that one of the means of effecting the fraud was through a drayage contract, also known as a "security agreement", between Terminal Warehouses, Inc., Dreer's company, and Produce Factors Corporation, Goldstein's company. It was charged that Dreer presented to Goldstein numerous invoices which contained false and fraudulent representations, and that Goldstein paid Dreer and that Dreer well knew that the invoices were false, fraudulent and fictitious. Dreer contended that there was a variance between the indict-

ment and the proof; he asserted that the dealings with respect to the spurious invoices were betweeen two companies whereby Sol Goldstein's Produce Factors Corporation was defrauded through Warehouses' fictitious paper. Our Circuit in an Opinion by Judge Biggs states as follows (at p. 32):

"Dealing now with the fact that the indictment names Sol Goldstein, as distinguished from his company, Produce Factors Corporation, as the subject of the mail fraud, there was no attempt to pierce the veil of corporate entity. There was evidence that Goldstein was the president of Produce Factors Corporation; Dreer asserts, therefore, that the government is put in the position of arguing, as it were, that if Dreer had given false invoices to a company such as General Motors Corporation it would constitute a scheme to defraud the president of that company. But it was stated in Berger v. United States, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935), that 'The general rule that allegations and proof must correspond is based upon the obvious requirements (1) that the accused shall be definitely informed as to the charges against him, so that he may be enabled to present his defense and not be taken by surprise by the evidence offered at the trial; and (2) that he may be protected against another prosecution for the same offense [citing cases].' In this case there is no doubt that the two specifications set out above were fulfilled.

It has long been the rule in this circuit, as in the other circuits, respecting mail fraud that: 'This crime against the United States . . . [is] the use of its mails in carrying out the scheme to defraud, and it was, therefore, necessary for the government to allege in the indictment, and prove at the trial, that the defendant devised a scheme or artifice to defraud; used the mails; and either sent or received mail connected with the scheme. If he were indicted for committing a fraud, of course it would be necessary to name the persons defrauded, and proof of fraud committed upon others would be improper, but, as we have said, the crime with which he is charged to have conspired to commit against the United States is not to defraud any person or persons, but to use the mails in carrying out a scheme to defraud, and the persons communicated with through the mails are only important to identify and show the scheme.' United States v. Marrin, 159 F. 767, 774 (E.D.Pa. 1908), affirmed 167 F. 951, 955–956 (3rd Cir. 1909).

We reiterate that the crime here was mail fraud, and though Goldstein's company, Produce Factors Corporation, was defrauded rather than Goldstein himself, the crime was committed against the United States by the use of its mails. This is the essential point. The evidence was overwhelming as to Dreer's actions in effecting the fraud. It cannot be maintained that he was not well aware of the basis of his indictment or that he was taken by surprise for it was stipulated by him and by his attorney that two government witnesses would testify that none of the invoices set forth in the indictment was contracted for by either McGuire Air Force Base or Fort Dix, nor was any payment ever made on them. Dreer's testimony did not contradict this statement to any substantial degree. As was said by Mr. Chief Justice Warren in Smith v. United States, 360 U.S. 1, 9, 79 S. Ct. 991, 996, 3 L.Ed.2d 1041 (1959): 'This Court has, in recent years, upheld many convictions in the face of questions concerning the sufficiency of the charging papers. Convictions are no longer reversed because of minor and technical deficiencies which did not prejudice the accused. E. g., Hagner v. United States, 285 U.S. 427 [52 S.Ct. 417, 76 L.Ed. 861]; Williams v. United States, 341 U.S. 97 [71 S.Ct. 576, 95 L.Ed. 774]; United States v. Debrow, 346 U.S. 374

[74 S.Ct. 113, 98 L.Ed. 92]. This has been a salutary development in the criminal law.' See also our recent decision in United States v. DeCavalcante, 440 F.2d 1264, 1272 (3rd Cir. 1971), wherein it was held that a defendant must demonstrate prejudice where the evidence offered at trial proves facts materially different from those alleged in the indictment. No prejudice is asserted by Dreer here. In *DeCavalcante* this court also ruled that the variance was not sufficiently substantial to amount to a constructive amendment to the indictment. Here the variance is almost immaterial. Cf. Stirone v. United States, 361 U.S. 212, 217–218, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), in which Stirone was convicted on a charge not laid in the indictment and his judgment of conviction was reversed by the Supreme Court. Compare also United States v. Williams, 412 F.2d 625 (3rd Cir. 1969). See Fed.R. Crim.Proc., Rule 7(c), 18 U.S.C.

No valid issue of double jeopardy presents itself here. Even if we take the broadest possible view in favor of Dreer the government would be prevented from trying him again on the facts in this record by the statements made on the Government's brief at 6–7. The first paragraph is typical and will suffice to demonstrate our point: 'A review of the evidence will show that there is no question but that all dealings involved in this case were between Mr. Goldstein and Mr. Dreer. Sol Goldstein on direct testimony constantly referred to himself and to Mr. Dreer as being the parties to the transactions.'" (Emphasis added)

The testimony was overwhelming in the instant case that a mail fraud scheme had been devised and the crime was committed against the United States by the use of the mails. The Defendants can demonstrate no prejudice whatsoever. In addition, the Defendants were well aware of the basis of the indictment and no surprise was even contended for in connection with the testimony as offered. This objection is, therefore, dismissed.

## VI. THE MAIL FRAUD SCHEME

The scheme in the instant case involved the execution and *fraudulent financing* of the home improvement contracts through installment loans from Homemakers Loan and Consumer Discount Company, the subsidiary of General Electric Credit Corporation. The Defendants knew, under all the reasonable inferences to be derived from the testimony presented, and particularly from their own efforts in covering up by way of collecting the installment payment books, that the mails would be used by Homemakers in transmitting the installment payment books to the homeowners and that this was a necessary part of the scheme in which they would defraud Homemakers. These Defendants used the mails to secure money for phoney home improvement loans, and intercepted the installment payment coupon books that were sent through the mail by the finance company to the supposed homeowner-borrower. In our factual situation, Gerald Schall did not complete the fraud at the time of the receipt of the cashed checks. The evidence clearly established that Michael Nikolich, one of the prime contributors to the success of the scheme, knew that mailings would occur in sending the contracts to Canton and also knew the extent of the falsity of these contracts. Knowing that the installment payment coupon books were mailed out from Canton, Ohio, Nikolich accepted payment on the installment coupon books after receipt of the same by the homeowners and the processing of these books by other Defendants who had intercepted the books in order to assure the success of their fraudulent scheme and to lull the homeowners into a false sense of security.

While this Opinion was being written the United States Supreme Court handed down its opinion in the case of the United States v. Thomas Maze, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (filed

Jan. 8, 1974) which here requires some discussion. In a five to four decision, the Supreme Court affirmed the judgment of the Court of Appeals for the Sixth Circuit reversing the mail fraud conviction of Maze. See: United States v. Maze, 468 F.2d 529 (6th Cir. 1972). Maze was charged with devising a scheme to defraud through unlawfully obtaining possession of a credit card in Louisville, Kentucky, issued by a Louisville bank, which he then used to obtain goods and services from motel operators in various states. Each of the establishments transmitted to the bank in Louisville the invoices representing the goods and services furnished by them. When Maze returned to Louisville, he was indicted on four counts of violation of the Mail Fraud Statute, 18 U.S.C. § 1341, and one count for the violation of the Dyer Act, 18 U.S.C. § 2312. A mail fraud scheme was charged to defraud the Louisville bank and several merchants in the different States, by the fact that Maze knew that each merchant would cause the sales slips of the purchases to be delivered to the bank in Louisville which would in turn mail them to the credit card holder for payment. The indictment also charged that the delay in the mailing would enable the defendant to continue purchasing goods and services for an appreciable period of time.

The Court specifically stated that:

"Because of an apparent conflict among the courts of appeals as to the circumstances under which the fraudulent use of a credit card may violate the mail fraud statute, we granted the Government's petition for certiorari."

In a footnote explaining the contrary views, the Supreme Court stated:

"The decision of the Court of Appeals for the Tenth Circuit in United States v. Lynn, 461 F.2d 759 (1972), appears consistent with the decision of the Sixth Circuit in the instant case. Five other courts of appeals apparently take a contrary view. E. g., United States v. Kellerman, 431 F.2d 319 (CA2 1970), cert. denied, 400 U.S. 957 [91 S.Ct. 356, 27 L.Ed.2d 266] (1970); United States v. Chason, 451 F.2d 301 (CA2 1971), cert. denied, 405 U.S. 1016 [92 S.Ct. 1291, 31 L.Ed.2d 479] (1971); United States v. Madison, 458 F.2d 974 (CA2 1972), cert. denied, 409 U.S. 859 [93 S.Ct. 145, 34 L.Ed.2d 105] (1972); United States v. Ciotti, 469 F.2d 1204 (CA3, 1972), cert. pending, No. 72–6155; Adams v. United States, 312 F.2d 137 (CA5, 1963); Kloian v. United States, 349 U.S. 291 (CA5, 1965), cert. denied, 384 U.S. 913 [86 S.Ct. 1349, 16 L.Ed. 2d 365] (1965); United States v. Reynolds, 421 F.2d 178 (CA5, 1970); United States v. Thomas, 429 F.2d 407 (CA5, 1970); United States v. Kelly, 467 F.2d 262 (CA7, 1972), cert. denied, 411 U.S. 933 [93 S.Ct. 1905, 36 L.Ed.2d 393] (1973); United States v. Kelem, 416 F.2d 346 (CA9, 1970), cert. denied, 397 U.S. 952 [90 S.Ct. 977, 25 L.Ed.2d 134] (1970)."

The Supreme Court assumed, as did the Court of Appeals, that the evidence would support a finding by the jury that Maze "caused" the mailings of the invoices he signed from the out-of-state motels to the Louisville bank. "But the more difficult question is whether these mailings were sufficiently closely related to respondent's scheme so as to bring his conduct within the statute." The majority of the Court acknowledged that:

"Under the statute, the mailing must be 'for the purpose of executing the scheme, as the statute requires,' Kann v. United States, 323 U.S. 88, 94 [65 S.Ct. 148, 151, 89 L.Ed. 88] (1944), but 'it is not necessary that the scheme contemplate the use of the mails as an essential element,' Pereira v. United States, *supra* [347 U.S.], at 8 [74 S.Ct. 358 at 362]."

The Defendant Maze relied on Kann v. United States, *supra,* where corporate officers and directors fraudulently obtained checks payable to themselves which were cashed or deposited at a bank and then mailed for collection to a

drawee bank, and Parr v. United States, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), in which the defendants obtained gasoline and other products and services for their own purposes by the unauthorized use of gasoline credit cards issued to the school district which employed them (in neither case did the Supreme Court find a sufficient connection between the mailing and the execution of the defendants' schemes).

The Government relied on *Pereira, supra,* and on United States v. Sampson, 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962) to support its position. The Court in *Maze* analyzed *Pereira* as involving a scheme whereby Pereira's wife would sell securities she possessed in Los Angeles and deposit the money in a bank of his choosing in El Paso, Texas; Pereira defrauded this wealthy widow of her property after having married her. Then after she received the check on The Citizens National Bank of Los Angeles from her brokers in Los Angeles, she gave it to Pereira who endorsed it for collection to The State National Bank in El Paso. The Supreme Court opined:

> "Thus the mailings in *Pereira* played a significant part in enabling the defendant in that case to acquire dominion over the $35,000 with which he ultimately absconded. Unlike the mailings in *Pereira*, the mailings here were directed to the end of adjusting accounts between the motel proprietor, the Louisville bank, and Meredith, all of whom had to a greater or lesser degree been the victims of respondent's scheme. Respondent's scheme reached fruition when he checked out of the motel, and there is no indication that the success of his scheme depended in any way on which of his victims ultimately bore the loss. Indeed, from his point of view, he probably would have preferred to have the invoices misplaced by the various motel personnel and never mailed at all.

The Government, however, relying on Sampson v. United States, *supra,* argues that essential to the success of any fraudulent credit-card scheme is the 'delay' caused by use of the mails 'which aids the perpetrator . . . in the continuation of a fraudulent credit card scheme and the postponement of its detection.' In *Sampson,* various employees of a nationwide corporation were charged with a scheme to defraud businessmen by obtaining advance fees on the promise that the defendants would either help the businessmen to obtain loans or to sell their businesses. Even after the checks representing the fees had been deposited to the accounts of the defendants, however, the plan called for the mailing of the accepted application together with a form letter assuring the victims that the services for which they had contracted would be performed. The Court found that *Kann* and *Parr* did not preclude the application of the mail fraud statute to 'a deliberate, planned use of the mails after the victims' money had been obtained.' 371 U.S., at 80 [83 S.Ct. 173 at 176]."

The Court felt that *Sampson* did not sustain the Government's position in the *Maze* case because the subsequent mailings there were designed to lull the victims into a false sense of security, postpone the ultimate complaint to the authorities, and make apprehension of the defendants less likely than if no mailings had taken place.

Mr. Justice Burger, with whom Mr. Justice White joined in dissenting, pointed out that the decision of the Court in *Maze* should be viewed as limited to the very narrow facts of Maze's criminal adventures and to the Court's seeming desire not to flood the Federal Courts with a multitude of prosecutions for relatively minor acts of credit card misrepresentation considered as more appropriately the business of the States. He further indicated:

> "The Court's decision, then, correct or erroneous, does not mean that the United States ought, in any way, to slacken its prosecutorial efforts under

18 U.S.C. § 1341 against those who would use the mails in schemes to defraud the guileless members of the public with worthless securities, patent medicines, deeds to arid and inaccessible tracts of land, or other empty promises of instant wealth and happiness."

And Mr. Justice White, with whom the Chief Justice, Mr. Justice Brennan and Mr. Justice Blackmun joined in dissenting, pointed out that apparently the majority was overlooking the salient fact that the fraud in the *Maze* case was practiced on the card issuer and not on the individual merchant who furnished the lodgings and meals to the respondent. Justice White then stated the following:

"Nor had respondent's plan reached fruition. For his part, he may very well not have schemed beyond obtaining the goods and services under false pretenses with a stolen credit card. But from a legal standpoint of criminal fraud, this was only the first and certainly 'not the last step in the fraudulent scheme. It was a continuing venture. . . . The use of the mails was crucial to the success of the fraudulent project. We are not justified in chopping up . . . the scheme into segments and isolating one part from the others. That would be warranted if the scheme were to defraud [only the merchants]. But it is plain that these plans had a wider reach and that but for the use of the mails they would not have been finally consummated.' Kann v. United States, supra, 323 U.S., at 96 [65 S.Ct. 148, at 152] (Douglas, J., dissenting)."

In carefully analyzing our own situation in the light of United States v. Maze, *supra,* we believe that the Defendants in this case are clearly guilty of a violation of the Mail Fraud Statute. To hold otherwise, we believe, would be to emasculate the Mail Fraud Statute so traditionally used to protect the public against fraudulent activity.

The scheme here brings our instant case directly within the authority of United States v. Sampson, *supra,* and not within those principles established in United States v. Maze, *supra.* It would be unsophisticated, indeed, to come to the conclusion in this case that the use of the mails was only "caused" by the Defendants in the sense of the finding of *Maze, supra,* for the scheme here required the use of the mails "for the purpose of executing such a scheme or artifice" as required by the Mail Fraud Statute.

The subsequent collection and/or interception of the installment payment books was done to further the fraud. Kann v. United States, *supra.* The Defendants knew the installment payment books would be mailed out by Homemakers Loan and Consumer Discount Company, and the Defendants knew that those books would have to be collected or intercepted. Certainly, the Defendants knew that in order for the installment payment books to be prepared, accounts would have to be forwarded together with the accompanying paper to Canton, Ohio, where the office which performed such preparation was located. The Defendants had sufficiently caused the mailing to Canton, Ohio and from Canton to the homeowners in the Pittsburgh area. It was certainly part of the scheme that these installment payment books were to be collected or intercepted from the homeowners and payments then made on these accounts which were mailed out to the individual homeowners. This was an essential part of the scheme as a means of concealment so that further frauds could be perpetrated. For this reason we believe the case of United States v. Maze, *supra,* is not applicable.

Under the testimony as presented to this Court, the Defendants had in many instances the intent to collect not once but twice from their fraudulent activities; they did so initially when they collected from the homeowners for performing non-existent repairs on the

homeowner's property, and they collected a second time when the home improvement installment contract was financed at Homemakers. It was a necessary concomitant of the entire scheme that the mailings charged in the Indictment be further used to lull Homemakers Loan and Consumer Discount Company and the General Electric Credit Corporation into further purchases of home improvement contracts from the Defendants' companies. It was only in the pyramiding of these contracts, after mailings had been made to the homeowners, that the scheme was able to produce the large amounts finally shown to have been here involved.

In brief summary, the Defendants' scheme included the collection of monies for construction work supposedly performed in accordance with home improvement contracts with the various homeowner victims. As was pointed out in this Court's original Opinion, in which the Defendants were adjudged guilty, the homeowner victims were carefully selected by the Defendants and were in a great majority of instances either people of advanced age or persons easily influenced. Thus, the Defendants were able to avoid performance of their contracts either by not doing the work as required, or by doing some very minor inexpensive cover-up work to make the victims think that the more extensive home improvement repairs contracted for, were being done. The homeowners, in a number of cases, paid cash for the contracts, and the Defendants would then divert the money to their own uses and finance the entire contract without regard to whether or not the homeowners may have made any payments thereon.

The Defendants, however, did not stop here. Instead, they then forged the homeowners' signatures, ages, and other important credit information on the home improvement installment contracts of Associated Town "N" Country Builders. While Associated was a legitimate broker for Homemakers, obviously these contracts were not. It was then,

through Michael Nikolich, that this false information was able to be covered up as he, in effect, knowing that the information on the installment loan applications was false, certified that the contracts were verified in all material respects. Nikolich thus made sure that the credit information on the installment loan applications was approved for payment without the normal investigation which would have put an end to the entire scheme at the very beginning. After payment was made by draft to the Defendants' companies, Nikolich then would process the contracts through to Canton, Ohio, where the coupon payment books were prepared and sent to the homeowner victims. The effect of this mailing was to carry out a portion of the scheme which had to involve the contract with Canton, Ohio or else Homemakers' books would have been immediately thrown out of balance with the accounts as maintained in Canton. This, again, shows the importance of the mailings in the entire scheme.

But this was not even the end of the scheme, for when the books were sent out and intercepted by the Defendants, either on the pretext that an error had been made in the amount or in the person to whom the book was sent, the next step was then to make payments on the installment loans, and make new contracts with other victims as soon as possible so that their income would always exceed the expenses of covering up their fraudulent activities. Thus, our case falls squarely within the rationale of United States v. Sampson, *supra,* and not within the rationale of United States v. Maze because, just as in *Sampson,* the mailings here were used to assure the other victims of the scheme, Homemakers Loan and Consumer Discount Company and the General Electric Credit Corporation, that the services which had been contracted for had been performed and that the financing agreements were genuine. For this reason the Mail Fraud Statute is applicable because there was a "deliberate, planned use of the mails after the victims' money had

been obtained." Thus, Judgment of Acquittal must be denied.

The guilt of the Defendants is hereby affirmed.

## VII. MULTIPLICITY OF COUNTS

■ Defendants have consistently objected to the number of counts charged in the Indictment. Their contention is to the effect that since only one basic fraudulent scheme may have been proven, the Indictment is multiplicitous and/or duplicitous. There is no basis for this contention. As early as 1916 the Supreme Court of the United States in an Opinion by then Mr. Justice Holmes stated as follows (Badders v. United States, 240 U.S. 391, 36 S.Ct. 367, 60 L.Ed. 706, 708–709):

"The case is brought to this court from the district court under § 238 of the Judicial Code, act of March 3, 1911, chap. 231, 36 Stat. at L. 1087, Comp.Stat.1913, § 1215, on the ground that it involves the construction and application of the Constitution of the United States. The plaintiff in error was indicted for placing letters in the mail for the purpose of executing a scheme to defraud devised by him, in violation of § 215 of the Criminal Code, act of March 4, 1909, chap. 321, 35 Stat. at L. 1088, Comp.Stat.1913, § 10,385. There were twelve counts, on seven of which, each relating to a different letter, he was found guilty. He was sentenced to five year's imprisonment on each count, the periods being concurrent, not cumulative, and also to a fine of $1,000 on each or $7,000 in all. The grounds for coming to this court are, first, that § 215 of the Criminal Code is beyond the power of Congress, as applied to what may be a mere incident of a fraudulent scheme that itself is outside the jurisdiction of Congress to deal with; and second, that if it makes the deposit of each letter a separate offense, subject to such punishment as it received in this case, it imposes cruel and unusual punishment and excessive fines.

These contentions need no extended answer. The overt act of putting a letter into the postoffice of the United States is a matter that Congress may regulate. Ex parte Jackson, 96 U.S. 727, 24 L.Ed. 877. Whatever the limits to the power, it may forbid any such acts done in furtherance of a scheme that it regards as contrary to public policy, whether it can forbid the scheme or not. Re Rapier, 143 [394] U.S. 110, 134, 36 L.Ed. 93, 102, 12 Sup.Ct.Rep. 374; Public Clearing House v. Coyne, 194 U.S. 497, 507, 24 Sup.Ct.Rep. 789, 48 L.Ed. 1092; United States v. Stever, 222 U.S. 167, 173, 32 Sup.Ct.Rep. 51, 56 L.Ed. 145, 147. See Lottery Case (Champion v. Ames) 188 U.S. 321, 357, 23 Sup.Ct.Rep. 321, 47 L.Ed. 492, 501, 13 Am.Crim.Rep. 561; United States v. Holte, 236 U.S. 140, 144, 35 Sup.Ct.Rep. 271, 59 L.Ed. 504, 505, L.R.A.1915D, 281. Intent may make an otherwise innocent act criminal, if it is a step in a plot. Aikens v. Wisconsin, 195 U.S. 194, 206, 25 Sup.Ct.Rep. 3, 49 L.Ed. 154, 160; Swift & Co. v. United States, 196 U.S. 375, 396, 25 Sup.Ct.Rep. 276, 49 L.Ed. 518, 524. The acts alleged have been found to have been done for the purpose of executing the scheme, and there would be no ground for contending, if it were argued, that they were too remotely connected with the scheme for the law to deal with them. The whole matter is disposed of by United States v. Young, 232 U.S. 155, 161, 34 Sup.Ct.Rep. 303, 58 L.Ed. 548, 551. As to the other point, there is no doubt that the law may make each putting of a letter into the postoffice a separate offense. Ebeling v. Morgan, 237 U.S. 625, 35 Sup.Ct.Rep. 710, 59 L.Ed. 1151; Re Henry, 123 U.S. 372, 374, 8 Sup.Ct.Rep. 142, 31 L.Ed. 174, 175. And there is no ground for declaring the punishment unconstitutional. Howard v. Fleming, 191 U.S. 126, 135, 24 Sup.Ct.Rep. 49, 48 L.Ed. 121, 124; Ebeling v. Morgan, *supra*." (Emphasis added.)

The United States Courts have consistently held in interpreting the Mail Fraud Statute that each mailing constitutes a separate offense and the counts of an indictment charging separate and distinct mailing offenses involving the same scheme to defraud can not be dismissed as multiplicitous. United States v. Williams, 424 F.2d 344 (5th Cir. 1970); revd. 5th Cir., 447 F.2d 1285 (on other grounds), cert. denied 405 U.S. 954, 92 S.Ct. 1168, 31 L.Ed.2d 231, rehearing denied (12 Count Indictment); United States v. Eskow, 422 F.2d 1060 (2nd Cir. 1970), cert. denied 398 U.S. 959, 90 S.Ct. 2174, 26 L.Ed.2d 544 (43 Count Indictment); Atkinson v. United States, 418 F.2d 1311 (8th Cir. 1969) (13 Count Indictment); Sanders v. United States, 415 F.2d 621 (5th Cir. 1969), cert. denied 397 U.S. 976, 90 S.Ct. 1096, 25 L.Ed.2d 271 (25 Count Indictment); Hanrahan v. United States, 121 U.S.App.D.C. 134, 348 F.2d 363 (1965) (65 Count Indictment); Milam v. United States, 322 F.2d 104, 109–110 (5th Cir. 1963); United States v. Brandom, 320 F.Supp. 520 (D.C.Mo.1970) (12 Count Indictment); United States v. Anzelmo, 319 F.Supp. 1106 (E.D.La. 1970) (16 Count Indictment); United States v. Mahany, 305 F.Supp. 1205 (N. D.Ill.1969) (3 Count Indictment); United States v. Interstate Engineering Corporation, 288 F.Supp. 402 (D.N.H. 1967); United States v. McGuire, 249 F.Supp. 43 (S.D.N.Y.1965), affirmed 2 Cir., 381 F.2d 306, cert. denied 389 U.S. 1053, 88 S.Ct. 801, 19 L.Ed.2d 848.

As was so well said by Judge Kraft in United States v. Gartman, 145 F.Supp. 420 at page 421 (E.D.Pa.1956):

"Finally, the defendant urges that, if an offense is charged, it is but one offense—one scheme—and that the first count is duplicated by all subsequent counts of the indictment. Each act of mailing, though done in furtherance of the execution of a single scheme, is a separate offense under this section. In re Henry, 1887, 123 U.S. 372, 8 S.Ct. 142, 31 L.Ed. 174; Badders v. United States, 1916, 240 U.S. 391, 36 S.Ct. 367, 60 L.Ed. 706; Mitchell v. United States, 10 Cir., 1944, 142 F.2d 480; Palmer v. United States, 10 Cir., 1955, 229 F.2d 861. Moreover, in Bozel v. United States, 6 Cir., 1943, 139 F.2d 153, an indictment under the same section, drawn precisely in the same form as the instant indictment, was held not to be duplicitous."

The Defendants' objection to the number of counts in the Indictment in the instant case must, thus, be denied.

## VIII. JOINT LIABILITY OF THE DEFENDANTS

The Defendants in their list of objections allege prejudice by the joinder of numerous counts (Paragraph 9) and by considering all three Defendants as jointly liable for the activities of the others when neither a conspiracy count nor an aiding and abetting count was included in the Indictment (Paragraph 28). These objections are without any legal merit.

Chief Judge Marsh of this Court held in the case of United States v. Dukow, 330 F.Supp. 360 at page 364 (W.D.Pa. 1971), affirmed 465 F.2d 688 (3rd Cir. 1972):

"When two or more parties are found to have joined in a common scheme, all are responsible for the acts and declarations of each co-schemer in furtherance of the scheme while it is in progress, and this is so regardless of whether conspiracy is charged in the indictment. When a common scheme has been found to exist, the general rules · of agency regarding joint liability are applied as a matter of evidence in determining guilt on the substantive counts. American Fur Co. v. United States, 27 U.S. (2 Pet.) 358, 365, 7 L.Ed. 450; United States v. Bernard, 287 F.2d 715, 719–721 (7th Cir. 1961); United States v. Olweiss, 138 F.2d 798, 799–800 (2d Cir. 1943); Coplin v. United States, 88 F.2d 652, 660–661 (9th Cir. 1937); 22A C.J.S. Criminal Law § 756b, pp. 1127–1128."

In this regard, we will point out with great particularity the roles of Schall and Nikolich in the portion of our Opinion dealing with the weight and credibility of various witnesses and the Court's interpretation of such testimony. At this point, however, we would like to dwell on the role played by the Defendant Torbich in this scheme. Defendants' co-counsel consistently and vehemently argued at the Hearing on the Motion for New Trial that if a man merely repairs furnaces, he can not be guilty of mail fraud. With this conclusion we, of course, agree but such is not the case with the Defendant Torbich. Defense Counsel's argument fails to take into consideration much of the testimony of Charles Celona to the effect that many of Torbich's duties were other than installing and/or repairing the furnaces. Celona testified that his (Celona's) main job was to stay with "Teddy" (Torbich) because he needed guidance, and to watch him so that he did not damage the "machines" but *falsified* the jobs that were needed on these "machines". (Tr. p. 1120) He further testified that the Schall controlled companies would be called by the homeowner to return since the workmen doing the job (and specifically mentioning "Ted") would do something to guarantee their return, e. g., loosen a screw. (Tr. p. 1123) Furthermore, some other duties of the Defendant Torbich included: taking pictures of the homes, retrieving the coupon books, and accepting money for jobs that supposedly were paid in full, while a huge indebtedness existed on the books of General Electric Credit Corporation and Homemakers Loan and Consumer Discount Company. See Government Exhibits 4(e), 4(g), 12(e), 14(e), 17(g) and 17(i). Numerous homeowners identified Torbich as the man who did the actual work.

From all of the evidence offered by the Government, both direct and circumstantial, we can only conclude that Defendant Torbich played a substantial role in this scheme to defraud. His dealings in this scheme were no less important and critical to the success of the scheme than were the activities of Defendants Schall and Nikolich. While Schall secured many of these jobs and Nikolich was able to have the loan application accepted by Homemakers, Torbich's role in falsifying the repairs, taking pictures of the homes, intercepting the coupon books, etc., was vital to the success of the scheme. Since the evidence is overwhelming that he was a partner in the scheme along with Schall and Nikolich, he must be charged with not only his own actions but also with those of his co-schemers. United States v. Dukow, *supra*. Each participant in a scheme to defraud is responsible for use of the mail to execute and carry out such a scheme. Isaacs v. United States, 301 F.2d 706 (8th Cir. 1962), cert. denied 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58 and Larrick v. United States, 371 U. S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58 and Ossanna v. United States, 371 U.S. 818, 83 S.Ct. 33, 9 L.Ed.2d 58 and Jeffords v. United States, 371 U.S. 818, 83 S.Ct. 33, 9 L.Ed.2d 58. It is not necessary that a defendant, charged with mail fraud violations, actually cause the mailings, so long as there is sufficient evidence which shows his activity is connected with the fraudulent scheme which involves the use of the mails. Milam v. United States, 322 F.2d 104 (5th Cir. 1963), cert. denied Kimball v. United States, 377 U.S. 911, 84 S.Ct. 1174, 12 L.Ed.2d 181. Since there is much more than sufficient evidence to tie Defendant Torbich into the fraudulent scheme as a participator and co-schemer and since the acts of the remaining Defendants, i. e., Schall and Nikolich, were the acts of the co-schemers involved in this fraud. Defendant Torbich is jointly liable for their criminal acts and the Court correctly adjudged him guilty in the original *Findings of Fact and Conclusions of Law*.

## IX. WEIGHT AND CREDIBILITY OF THE VARIOUS WITNESSES

Defense Counsel have consistently objected to the interpretation, weight and

credibility given to the testimony of numerous government witnesses. In this non-jury case the Court must be the ultimate factfinder. After careful review and analysis of the transcript of the trial, we can only conclude that the Court did not err in crediting the testimony of Witnesses Celona, Holtzman, Fitchwell, Grove, and Spivey, as more particularly herein discussed.

Celona had previously been in the employ of Schall. He explained in great detail how the scheme operated. All three Defendants were exposed as to the the various roles and duties they performed in this operation, e. g., the picture taking of the homes, the confirming of the loan applications brought to Nikolich, the turning over of the Homemaker's check to one of Schall's cohorts by Nikolich, the taking of this check to Holtzman, the exchange made for a smaller check from Holtzman, the various heating companies Schall was involved with and the use of money orders by Schall paid to Nikolich to keep the fraudulent loan payments current. The Court took into full consideration the rather controversial background of Celona, but after considering the vigorous cross-examination by Defense Counsel, which left his testimony unshaken, and the exhibits offered by the Government and introduced in the course of Celona's testimony, we can only conclude that his testimony was credible and that proper weight was given to it.

The testimony of Fitchwell corroborated that of Celona. He too was an associate of Gerald Schall. He testified in essence that Schall controlled various heating companies and that he had delivered money to Nikolich from Schall. The Court found his testimony to be credible and substantiated by many of the exhibits introduced into evidence.

The testimony of Carl Grove, the Manager of the Monroeville Office of Homemakers, served to explain the role of Nikolich and how the local office of Homemakers in Monroeville had been duped in this scheme. Contrary to Defendants' contentions, the testimony of Carl Grove is quite credible. Grove testified that Nikolich was the head of the home improvement section of the Monroeville Office and was to have audited the proposed contracts. (Nikolich's signature, as the investigating officer, was on most of the credit investigations supposedly performed by Homemakers on these loan applications. See Government Exhibits 1, 3, etc.) Nikolich was also to handle the credit collections, etc. Grove testified concerning how the alleged fraud was discovered, and about Nikolich's subsequent departure from Homemakers. The testimony given by Grove was further corroborated by that of Peter Semo, another employee of Homemakers. (See Tr. pp. 1631–1651)

The testimony of Irwin Holtzman is likewise credible. Holtzman's testimony served to incriminate both Schall and Nikolich. His company's paper, i. e. "Associated Town 'N' Country", was used as the basis for securing the loans as the authorized broker of Homemakers. The Government Exhibits, along with Holtzman's testimony, showed that the Homemakers' checks made out to Associated would be exchanged by Associated for a check (less 10% from the original check) payable to Calvin Wendy or the Jericho Corporation. This would then be pocketed by Gerald Schall. We can only conclude that the process which Holtzman described occurred as he explained it and that 90% of the proceeds of the original Homemakers' checks came into the possession and control of Schall.

Robert Spivey testified to the method of operation of the General Electric Credit Corporation and the relationship of Homemakers to General Electric Credit. He explained in detail the procedure involved in the processing of loans and the operation of the Service Center in Canton, Ohio. His testimony established how the loan applications were processed, and explained what the

different Government Exhibits were in relation to the G. E. Credit records in Canton and also those on file at Homemakers. (See Tr. pp. 1357–1518) His testimony established that all coupon books were mailed from Canton to the homeowners in the Pittsburgh area. (See Tr. pp. 1382, 1383)

The Defendants objected to the specific findings as to Jesse Johnston, Charner Chick, and Ronald Bock. (Paragraphs 23, 24 and 26) These objections are without merit. As described in the Court's Findings of Fact (pp. 5–16 of the original Opinion), the difference between what the parties had agreed to with Schall's controlled companies and what actually appeared on the records of General Electric Credit Corporation in Canton, Ohio and in the Homemakers' Office in Monroeville, was indeed impressive. In Johnston's case, he agreed to have minor repairs performed by Peoples Service Gas for $597.00 (See Government Exhibits 8E and 8F) payable in monthly installments of $25.00. He ended up with a debt of $6,586.44 owing to G. E. Credit and a judgment entered against him and in favor of Homemakers in the Allegheny County Court. Johnston is listed as being sixty-four years of age when, in fact, he is eighty-three and uninsurable for loans. The Charner Chick situation presents another example. Chick had a furnace installed in the Spring of 1971 and he is paying $86.00 a month to Pittsburgh National Bank on an installment plan. Along with this debt, he is paying Avco Finance $69.93 per month for additional work that he is not quite clear on. To further complicate his financial situation, he owes Homemakers the sum of $7,019.88; he has no knowledge of ever having undertaken this debt, yet the Canton Office shows that the first ten monthly payments of $83.57 were paid on this debt account. (See Government Exhibit 1 and all remaining Exhibits referring to the Chick account) The G. E. Credit files list Chick as being sixty-

two years old while his actual age is seventy-three. The situation in the Bock transaction shows a similar drastic departure from what the homeowner had agreed to as compared to what appeared on the G. E. Credit records.

Although the Court used these three transactions as detailed examples of the fraud that occurred, the defense sought specific findings for each homeowner-victim, and even questioned the findings concerning these three homeowners. The Court at this point adds that further examination of the record establishes only in greater detail the fraudulent schemes of the Defendants. The scheme was built on homeowners of advanced age and/or homeowners of average or less than average intelligence and education. The defense constantly seeks more specific findings in regard to each count where a judgment of guilt was entered. Certainly, Counts 2, 16 and 50 need no further discussion.

Counts 5 and 6 concern the mailing of a contract of Arthur Heil for home improvements, and the return mailing of the coupon book from Canton. As stated in our prior Findings of Fact only *four* of the odd numbered counts were proven to have been mailed to Canton from Pittsburgh. These included Count 5 (Heil), Count 29 (Curtis), Count 35 (Koval) and Count 51 (Crystian). For the reasons stated in the previous Findings of Fact, we see no necessity to discuss these odd numbered counts in any greater detail. In regard to Count 6 concerning Homeowner Heil, we once again see the results of the Schall operation. Heil is seventy-three years of age; never negotiated a contract with Homemakers; did make prior installment purchases which he has paid off excepting one to Avco; he does not know what he is paying on or when that loan occurred. The G. E. Credit records list his age as sixty-four and show him owing G. E. Credit $6,520.58 including principal and interest (Government Exhibit 3); the investigation on the appli-

cation was made by Nikolich, and seven payments of $78.41 have been made on this loan via money orders (Government Exhibit 3(a) and Tr. pp. 720–740); Government Exhibit 3(b) includes a copy of the contract and a copy of a check made payable to Associated for $3,875.00, the principal amount borrowed; Government Exhibit 3(c) includes a copy of a check made to Calvin Wendy (Schall) for $3,485.00, which is the proceeds fraudulently obtained by Schall; Government Exhibit 3(e) is the coupon book sent out from Canton to Homeowner Heil.

Count 8 involved home improvements to the home of Elizabeth Wallace. This homeowner testified that she had certain repairs done and had *paid cash for them*; she then had additional work done and signed an installment contract; but she changed her mind, and paid cash for the remaining work performed. See Government Exhibits 4(h), 4(i), 4(j) and 4(k). All told Mrs. Wallace had *paid* close to $5,000 for various home improvements, yet General Electric Credit had a loan on their books in the amount of $2,659.80 on which seven payments were made via money orders. Mrs. Wallace denies ever obligating herself for such amount (Tr. pp. 1316–1337). She states that she is seventy-seven years old while she is listed as being in her sixties on the credit records; the credit investigation at Homemakers was performed by Nikolich (Government Exhibit 4). Government Exhibit 4(c) includes an $1,875.00 voucher for a check made payable to Associated from Homemakers and a $1,685.00 check made payable to Calvin Wendy (Schall) from Holtzman.

Count 10 involved home improvements to the home of Nellie Brooks, also known as Nellie Miller; this homeowner denied ever making the indebtedness found on the books of G. E. Credit and Homemakers. (See Tr. pp. 1561–1572.) She is eighty-seven years of age. On the G. E. Credit records she is listed as being six-ty-five. The application was investigated by Nikolich. Government Exhibit 5(a) shows that six payments had been made to keep this loan current; Government Exhibit 5(b) shows the check from Homemakers to Associated for $3,875.00 and 5(c) shows a check to Calvin Wendy (Schall) from Associated for $3,485.00. From all the evidence we can only conclude that the Defendants are guilty as charged on Count 10 and accept the testimony of the homeowner as true and credible.

Count 12 involved home improvements to the home of Bessie Popovich, also known as Borbal Popovich. This woman paid over $3,000.00 *in cash* for work performed by various Schall controlled companies (Tr. pp. 1520–1559) (Government Exhibits 6(d) through 6(m)). Although the homeowner never obligated herself to General Electric Credit or Homemakers, their records listed an indebtedness of $3,640.20 on which six payments by money orders had been made to keep the account current; the loan application was investigated by Nikolich; her age on the G. E. Credit records was sixty-six, yet she testified that she was seventy-five years of age. The Government Exhibits include a similar set of two checks, i. e., one from Homemakers to Associated, and one from Associated to Calvin Wendy (Schall) deducting approximately 10% from the original check. See Government Exhibits 6(b) and (c). We find the testimony of this homeowner to be completely credible, and the Defendants guilty on Count 12.

The remaining counts will be discussed in less detail than those above, but the Court will state in detail where the proffered evidence of the Government is in the record and the credibility given to such evidence.

From the testimony of Freda Markle (Tr. pp. 1232–1250) together with Government Exhibits 7 through 7(1), the Court concludes beyond a reasonable doubt that the Defendants are guilty of the charges of Count 14.

As to the remaining homeowners, the references are as follows:

Count 26—Government Exhibits 10 through 10(e)
Transcript pp. 418–490
Count 28—Government Exhibits 11 through 11(c)
Transcript pp. 568–588
Count 30—Government Exhibit 12 through 12(i)
Transcript pp. 871–899
Count 32—Government Exhibit 13 through 13(f)
Transcript pp. 1347–1356
Count 34—Government Exhibit 14 through 14(e)
Transcript pp. 771–784
Count 36—Government Exhibit 15 through 15(i)
Transcript pp. 1603–1630
Count 42—Government Exhibit 16 through 16(f)
Transcript pp. 1582–1600
Count 44—Government Exhibit 17 through 17(m)
Transcript pp. 670–718
Count 46—Government Exhibit 18 through 18(f)
Transcript pp. 1251–1268
Count 48—Government Exhibit 19 through 19(d)
Transcript pp. 589–609
Count 50—Bock transaction—considered in detail in the original Findings
Count 52—Government Exhibits 21 through 21(g)
Transcript pp. 1089–1101
Count 56—Government Exhibit 22 through 22(h)
Transcript pp. 494–568
Count 58—Government Exhibit 23 through 23(f)
Transcript pp. 1018–1055
Count 60—Government Exhibit 24 through 24(q)
Transcript pp. 1017–1088

The testimony of the respective homeowners is credible and along with the testimony of the G. E. Credit and Homemakers employees and the exhibits submitted, sustains the guilt of the Defendants beyond any reasonable doubt.

 This Court is well aware of the rule that credibility determinations are not reviewable on appeal. United States v. Sangster, 442 F.2d 1289 (7th Cir. 1971). In a trial by the Court without a jury it is for the Trial Judge to assess the weight and credibility of the witnesses' testimony. United States v. Rojas, 458 F.2d 1355 (9th Cir. 1972). The Trial Judge in a non-jury criminal prosecution must carefully weigh and determine the credibility to be given to the testimony of witnesses. Fernandez-Delgado v. United States, 368 F.2d 34 (9th Cir. 1966). With these principles in mind, this Court had made a determination after a considered review of the record that the testimony of the various challenged witnesses was credible, and that the proper weight was given to their courtroom testimony; they estab-lished the guilt of the Defendants beyond a reasonable doubt.

The Defendants have further objected to the admissibility of G. E. Credit and Homemakers records (Paragraph 18), and further allege that the Trial Judge improperly restricted cross-examination (Paragraph 16). These objections are without merit. One has only to examine the transcript composed of 1660 pages, of which approximately one-half consists of objections and colloquy with the Defense Counsel. There is no reason to pursue this matter any further.

 In regard to the records of General Electric Credit Corporation and Homemakers, their admission into evidence violated no rules of evidence that this Court is aware of, and while Defense Counsel objected to their admission, he stated no specific reasons why such records should not be admitted. From this we surmise that his objection is based on their relevancy to the Defendants. The Court concludes from the entire record that their admission was correct.

## X. MOTION FOR JUDGMENT OF ACQUITTAL AND FOR NEW TRIAL

The Defendants allege that the Court erred "in not directing a verdict of acquittal" (Paragraph 8), that the verdict is against the weight of the evidence (Paragraph 12), and that the interests of justice require a new trial (Paragraph 5). To prevent further confusion, this Court treats the above objections as the requisite Motions under Rules 29, 33 and 34 of the Federal Rules of Criminal Procedure.

Rule 29, Fed.R.Crim.P. provides as follows:

"(a) Motion Before Submission to Jury. Motions for directed verdict are abolished and motions for judgment of acquittal shall be used in their place. The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in

the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses. If a defendant's motion for judgment of acquittal at the close of the evidence offered by the government is not granted, the defendant may offer evidence without having reserved the right.

(b) Reservation of Decision on Motion. If a motion for judgment of acquittal is made at the close of all the evidence, the court may reserve decision on the motion, submit the case to the jury and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict.

(c) Motion After Discharge of Jury. If the jury returns a verdict of guilty or is discharged without having returned a verdict, a motion for judgment of acquittal may be made or renewed within 7 days after the jury is discharged or within such further time as the court may fix during the 7-day period. If a verdict of guilty is returned the court may on such motion set aside the verdict and enter judgment of acquittal. If no verdict is returned the court may enter judgment of acquittal. It shall not be necessary to the making of such a motion that a similar motion has been made prior to the submission of the case to the jury."

We have considered that the Defendants' Motion for Judgments of Acquittal has clearly raised the question of the sufficiency of the evidence (as did their not guilty pleas). United States v. Pitts, 428 F.2d 534 (5th Cir. 1970); Schutz v. United States, 422 F.2d 991 (5th Cir. 1970); United States v. Besase, 373 F.2d 120 (6th Cir. 1967).

█ The law is well settled that on such a motion there must be taken all inferences and a view of the evidence most favorable to the Government. United States v. Bradley, 447 F.2d 657 (3rd Cir. 1971); United States v. Feld-

man, 425 F.2d 688 (3rd Cir. 1970). After reviewing the evidence and applying the aforementioned principle, we conclude that the Motion for Judgment of Acquittal must be denied. The evidence taken in any light establishes beyond a reasonable doubt that a complicated scheme existed in which the Defendants were active participants in various roles and used the mails to secure home improvement contracts and pocket the proceeds fraudulently received for such contracts. The Motion for Judgment of Acquittal is therefore denied.

Rule 33, Fed.R.Crim.P. provides as follows:

"The court may grant a new trial to a defendant if required in the interest of justice. If trial was by the court without a jury the court may vacate the judgment if entered, take additional testimony and direct the entry of a new judgment. A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case. A motion for a new trial based on any other grounds shall be made within 5 days after verdict or finding of guilty or within such further time as the court may fix during the 5-day period."

█ On a Motion for New Trial where the basis of such a motion is that the verdict is contrary to the weight of the evidence, the Court weighs the evidence of both sides, considers the credibility of the witnesses, and if the verdict is against the weight of the evidence, the Court should grant a new trial United States v. Joines, 327 F.Supp. 253 (D.C.Del.1971). The Court must be governed by the Interest of Justice Test. United States v. Neff, 343 F.Supp. 978 (E.D.Pa.1972). The standards concerning a Rule 33 Motion as set forth in the *Neff* case are:

"Rule 33 of the Federal Rules of Criminal Procedure, 18 U.S.C., permits a District Court to grant a mo-

tion for a new trial 'if required in the interest of justice'. The Court may grant a new trial only upon motion of a defendant. United States v. Green, 134 U.S.App.D.C. 278, 414 F.2d 1174, 1175 (1969); United States v. Vanterpool, 377 F.2d 32, 34–36 (2d Cir. 1967). The motion itself is addressed to the Court's sound discretion. Dranow v. United States, 307 F.2d 545, 566–567 (8th Cir. 1962); United States v. Basen, 308 F.Supp. 65, 66 (E.D.Pa.1970). It has been held that motions for new trials are not favored and should be granted only with great caution, United States v. Redfield, 197 F.Supp. 559, 562 (D.Nev.1961), aff'd., 295 F.2d 249 (9th Cir. 1961), cert. denied 369 U.S. 803, 82 S.Ct. 642, 7 L.Ed.2d 550. Such disfavor, however, is generally confined to motions for a new trial based on newly discovered evidence where lapse of time hampers the ability of the Government to retry its case. United States v. Smith, 179 F.Supp. 684 (D.D.C.1959). When the grounds of the motion are that the verdict is contrary to the weight of the evidence or not supported by substantial evidence, the Court should be governed by the 'interest of justice' alone. See, United States v. Parelius, 83 F.Supp. 617, 622 (D.Hawaii 1949). Where it is claimed, however, that 'error' was committed in the course of the trial, a more definitive set of standards apply. A convicted defendant has the burden of showing first, that error was committed and, second, that such error was prejudicial to him. United States v. Basen, *supra*, 308 F.Supp. at 66; United States v. Redfield, *supra*, 197 F.Supp. at 562. Even if demonstrated to exist, an error which 'does not effect substantial rights' is considered 'harmless' and shall be disregarded. Federal Rules of Criminal Procedure, Rule 52(a), 18 U.S.C. To determine whether or not a given error is harmless, two slightly different tests have evolved. Where the error is of federal constitutional dimension the test is whether it was 'harmless beyond a reasonable doubt'. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Where, however, the error is not of constitutional magnitude, the test is whether the Court can conclude 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error'. Kotteakos v. United States, 328 U.S. 750, 764–765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946); United States v. Panczko, 429 F.2d 683, 686–687 (7th Cir. 1970). It has been held that the decisive factors are the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error. Gaither v. United States, 134 U.S.App.D.C. 154, 413 F.2d 1061, 1079 (1969) (citing cases)." (Emphasis added)

After applying the applicable tests of law, we conclude that the Defendants are not entitled to a new trial for the "Interest of Justice" test has not been met. Further, if any error has been shown it was harmless beyond a reasonable doubt even though that test has not been urged on this Court.

Rule 34, Fed.R.Crim.P. provides as follows:

"The court shall arrest judgment if the indictment or information does not charge an offense or if the court was without jurisdiction of the offense charged. The motion in arrest of judgment shall be made within 5 days after determination of guilt or within such further time as the court may fix during the 5-day period."

██ A Motion in Arrest of Judgment must be based upon failure of the indictment to charge an offense or upon a finding that the court is without jurisdiction of the offense. United States v. Whitted, 454 F.2d 642 (8th Cir. 1972). Since this Court has gone into a quite detailed analysis of any and all alleged defects in the Indictment, and since the jurisdiction of a Federal District Court

in trying a case where the charges concern mail fraud is quite obvious, we see no reason to consider this Motion any further. The Rule 34 Motion raised by the Defendants is hereby denied. The Defendants' original convictions of guilt on Counts 2, 5, 6, 8, 10, 12, 14, 16, 26, 28, 29, 30, 32, 34, 35, 36, 42, 44, 46, 48, 50, 51, 52, 56, 58, and 60 of the Indictment are, therefore, affirmed.

An appropriate order will be entered.

## APPENDIX

### MOTION FOR NEW TRIAL

And now appear Gerald Schall and Michael Nikolich and respectfully object to the adjudication of guilt and the various findings of the Honorable Daniel J. Snyder, District Judge.

The objection will not be as specific or as detailed as it otherwise would be because, in the event there is no sentence of incarceration, Gerald Schall and Michael Nikolich will make no objection and will not appeal the judgment of sentence.

1. The Opinion and decree do not comply with Federal Rule of Criminal Procedure 23(c) because the findings and conclusions are not sufficiently specific. United States v. Livingston, 3 Cir., en banc, 1972, 459 F.2d 797, 798.

2. The Court erred in not suppressing the evidence.

3. The Court erred in not granting an evidentiary hearing in regard to examination by the Court of Jencks statements which were not admitted into the evidence of this case or relevant in the posture of the case.

4. The trial Judge erred in not holding an evidentiary hearing concerning the interview with Michael Nikolich and his alleged intention to plead guilty and become a United States witness against the other two defendants.

5. The interests of justice require a new trial.

6. The findings are clearly erroneous.

7. The entire evidence does not make out a case of mail fraud beyond a reasonable doubt in regard to each and/or all counts on which defendants were found guilty.

8. The Court erred in not directing a verdict of acquittal on each and all counts.

9. Defendants were prejudiced by the joinder of six counts. All previous objections in this respect are incorporated into this Motion, including the objection before trial and at trial.

10. The evidence in the case is not sufficient to find beyond a reasonable doubt that a scheme existed in violation of 18 U.S.C. § 1341.

11. The Court erred in not distinguishing between General Electric Credit Corporation and Homemakers.

12. The verdict is against the weight of the evidence and against the evidence.

13. The trial judge, in his findings, did not sufficiently and specifically differentiate conflicting testimony.

14. The Court erred in admitting evidence and not striking evidence. The various objections made at trial are incorporated into this Motion.

15. Neither the scheme nor the trial evidence justify the finding that the mail was to be used as part of any scheme to defraud.

16. The trial judge improperly restricted cross-examination in violation of the case law and the 6th Amendment to the United States Constitution.

17. The Court erred in permitting numerous counts to be tried when only one crime was involved. The prosecution split one scheme into 60 criminal acts contrary to case law and the 5th Amendment to the United States Constitution. All pre-trial motions on this area are incorporated by reference into this Motion.

18. The Court erred in admitting General Electric Credit Corporation and Homemaker records into evidence.

19. The Court erred in not specifically dealing with the evidence and guilt or

innocence on each count, including those which were dismissed.

20. As permitted by Federal Rule of Criminal Procedure 23(c), defendants again request the Court to make specific findings of fact and conclusions of law concerning the guilt on each and every count which has been adjudicated rather than having a general opinion which does not specifically relegate each bit of evidence into each specific count so that the matter can be preserved on appeal and intelligently and explicitly understood by the Court of Appeals in the event an appeal is required. Defendants respectfully suggest that the trial judge has not complied with sufficient specificity in regard to the said Federal Rule of Criminal Procedure 23(c).

21. All pre-trial motions and proceedings, including the civil action involving the situation, are incorporated by reference into this Motion. Otherwise, the Motion would be as voluminous as the papers already filed of record. In the event the trial judge objects to this procedure, defendants respectfully request additional time to examine the drawer of files which pertain to this case so that a more specific Motion can be filed if the court so requests.

22. The trial judge erred in saying that Homemakers was a wholly owned subsidiary of General Electric and also including the two corporations as interchangeable in the case even though they were separate corporations, with separate Boards of Directors, etc.

23. The findings as to Jesse Johnston are not supported by the evidence and/or not supported in the evidence in a sufficient degree to prove the crime charged beyond a reasonable doubt.

24. The findings as to Charner Chick are not supported by the evidence and/or not supported in the evidence in a sufficient degree to prove the crime charged beyond a reasonable doubt.

25. The trial judge's findings as to credibility were erroneous and not supported by the evidence and contrary to the evidence.

26. In regard to Irwin Holtzman, the Court did not take into consideration a Motion filed after trial indicating that Holtzman had not been candid in his testimony. This Motion is incorporated into the present Motion.

27. The findings as to Ronald Bock are not supported by the evidence and/or not supported in the evidence in a sufficient degree to prove the crime charged beyond a reasonable doubt.

28. The Court erred in considering all three defendants as joined and responsible for the activity of the others when no conspiracy count was involved nor was any aiding and abetting count involved.

29. The Court erred in crediting any testimony given by Celona who was a witness beyond belief and a professional government witness.

30. The Court erred in crediting the testimony of John A. Fitchwell who was not a credible witness. In fact, Fitchwell testified, as the record shows, to save his own skin and as part of a deal.

31. The Court erroneously concluded that the testimony of Karl Grove implicated Nikolich and this finding is not supported by the record.

32. The trial judge erred in crediting the testimony of Robert Spivey and did not specifically allocate it to the various counts involved, all in violation of Rule 23(c).

33. The findings of fact are clearly erroneous as are the conclusions of law. They also do not comply with the specificity necessary under Federal Rule of Criminal Procedure 23(c) and defendants respectfully request that they be revised to so comply so that defendants may evaluate the findings of the Court in regard to the testimony, decide whether to appeal, be able to prepare an intelligent and efficient Brief and argue the matter to the Court of Appeals and any other Court efficiently and with proper expertise. Additionally, the present findings will not be sufficient for any Court of Appeals to determine

exactly what the trial judge has found, all in violation of said Rule 23(c).

WHEREFORE, defendants Nikolich and Schall respectfully request that a new trial be granted. In the alternative, defendants respectfully request that proper findings be made as required by Federal Rule of Criminal Procedure 23(c) and/or that the judgment be arrested because the prosecution did not prove beyond a reasonable doubt the guilt of defendants as to any or all counts discussed by the Honorable trial judge.

·Respectfully submitted,
(s) ————————————

Allen N. Brunwasser
Attorney for Defendants
Schall and Nikolich